# STATE OF MICHIGAN

# COURT OF APPEALS

DEAN ALTOBELLI,

        Plaintiff-Appellee,

v

MICHAEL W. HARTMANN, MICHAEL A.
COAKLEY, M. ANNA MAIURI, JOSEPH M.
FAZIO, DOUGLAS M. KILBOURNE, JOHN D.
LESLIE, and JEROME R. WATSON,

        Defendants-Appellants.

FOR PUBLICATION
November 4, 2014
9:05 a.m.

No. 313470
Ingham Circuit Court
LC No. 2012-000635-CZ

Before: BORRELLO, P.J., and SERVITTO and Beckering, JJ.

BORRELLO, P.J.

Plaintiff Dean Altobelli filed a multi-count complaint against defendants alleging that defendants wrongfully terminated his property interest in his membership at Miller Canfield Paddock & Stone, PLLC ("Miller Canfield" or "the Firm"). On November 7, 2012, the circuit court denied defendant's motion for summary disposition and motion to compel arbitration, and granted plaintiff's motion for partial summary disposition under MCR 2.116(C)(10) on Count II (shareholder oppression), Count III (conversion), and Count V (tortious interference with a business relationship or expectancy). This Court granted defendants' application for leave to appeal the circuit court's order and stayed further proceedings in the lower court.[1]  For the reasons set forth in this opinion, we affirm the circuit court's order denying defendants' motion to compel arbitration, reverse the circuit court's order granting partial summary disposition in favor of plaintiff, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### i. Plaintiff's Membership in the Firm

---

[1] *Altobelli v Hartmann*, unpublished order of the Court of Appeals, entered April 16, 2013 (Docket No. 313470).

-1-

Prior to the events leading to this lawsuit, plaintiff Dean Altobelli was a senior principal at Miller Canfield, where he worked for 17 years. Plaintiff became an equity owner in the firm in January 2006. In late May or early June of 2010, plaintiff, who previously played football at Michigan State University when Nick Saban was the head coach, was offered an opportunity to work as a coach/intern for Saban at the University of Alabama football program. Plaintiff proposed a 7-12 month leave of absence to defendant Michael Hartmann, Chief Executive Officer (CEO), and one of the managers of Miller Canfield, and to Michael Coakley, who was not a manager, but was head of the firm's litigation practice group, of which plaintiff was apparently a member. Plaintiff proposed that he could return as senior principal any time before June 1, 2011.

Plaintiff contends that Hartmann "supported my opportunity" and that Hartmann stated that plaintiff could spend as much time as needed at Alabama and still receive certain allocated income from his clients. Defendants and specifically, defendant Hartmann, dispute this assertion, stating that Hartmann "never promised Altobelli that he could have any kind of leave of absence, and made no statements about supporting a leave of absence upon which he reasonably could rely." Hartmann claimed that plaintiff "asked for my opinion about whether he could come back to the Firm" and that Hartmann replied he "thought that [plaintiff] probably could." However, Hartmann averred that both he and plaintiff "knew that I was not in a position to make any commitment . . . as I did not have the authority to make such a commitment." Hartmann further stated that "no principal of the Firm has ever been given approval to work full time at another job while remaining a principal at Miller Canfield." Plaintiff represented that in reliance on his view of Hartmann's statements, he "moved to finalize arrangements with the University of Alabama while preserving [my] business at the Firm" and he executed documents with Alabama in June 2010. Plaintiff stated that he spent "about 400 hours during June and July 2010" preserving clients and business for the Firm.

Plaintiff alleged that Hartmann "did a 180 degree turn" when Hartmann returned from a June 2010 vacation and he "rejected the idea of a leave of absence that protected my ownership interest stating that instead he wanted me to withdraw from the Firm without any written assurance that my ownership would be protected." Plaintiff sent an e-mail on July 7, 2010, seeking approval from Hartmann and the managers "under section 2.17 of the [Firm's] operating agreement to approve my outside compensation with the University of Alabama." As an alternative, plaintiff also addressed compensation due him if "I withdraw from the firm."

Plaintiff asserts that despite his several requests, the Firm managers would not meet with him to discuss his status. In e-mails dated July 7 and July 8, 2010, plaintiff stated: "I have no plans to resign from the firm as of the end of June" and "I will not voluntarily resign my principal status and compensation at this time." On July 20, 2010, plaintiff detailed his goals and contributions for the coming reporting period (July 2010 – June 2011), including the value of the Alabama opportunity. Plaintiff stated that the next day, July 21, 2010, "Hartmann called me and told me that the managers decided to 'terminate' [my] ownership effective July 31, 2010." Plaintiff "demanded a vote of the principals" and an opportunity to present his case to them, asserting that the managers lacked authority to terminate his ownership interest.

Plaintiff averred that he sent an email to the managers on July 22, 2010, asserting that he disagreed with the decision to terminate his ownership status and questioned defendants'

authority to terminate his ownership. Hartmann replied to plaintiff's July 22, 2010 e-mail that same day stating: "I did not say the Firm had terminated your position. I told you that since you had voluntarily accepted a full time position at Alabama and had already started there, the Firm would consider you to have withdrawn from the partnership as of July 31, 2010." Hartmann reiterated, "[t]he Firm did not terminate your position. You voluntarily accepted another full time job in Alabama."

Plaintiff stated that he continued to work for the benefit of his clients and the Firm throughout 2010, alleging that he was "shorted" on his 2010 income. Plaintiff claimed various other members of the firm were not aware of the situation and felt "Hartmann had a duty to sit down . . . to work things out" and the situation that developed "should have never happened." Hartmann responded that the Firm compensated plaintiff for his 2010 work and that he received additional money by appealing the original compensation award.

Hartmann stated that on "information and belief," plaintiff continued to be employed by the University of Alabama football program as of September 12, 2012. Defendants contend that plaintiff "never did return to the Firm, or ask for the return of any client or case."

*ii. The Firm's Operating Agreement*

Miller Canfield is a professional limited liability company under the Michigan Limited Liability Company Act (LLCA), MCL 450.4101 *et seq.* The internal affairs of the Firm are governed by the Miller Canfield Operating Agreement ("Operating Agreement"). The Operating Agreement provides that members of the Firm are referred to as "principals" (§2.3), it vests five senior principals, who are the managing directors, with "[s]ole, full and complete power and authority to manage [the Firm]" (§2.8). The Operating Agreement provides the managing directors with authority to appoint a CEO who has "with binding effect on the Managing Directors, the power and authority of the Managing Directors with respect to the day-to-day administration of the business and affairs of the Firm between meetings of the Managing Directors" (§2.14).

The responsibilities of the principals are set forth in §2.17 of the Operating Agreement and §2.29 governs the withdrawal of a principal; those provisions provide in relevant part as follows:

> 2.17 Responsibilities of Principals. Each Principal shall devote his or her full time and best efforts to the success of the Firm except as otherwise approved in writing by the CEO with the approval of the Managing Directors. Without limiting the generality of the foregoing, no Principal may serve (i) as an executor, administrator, trustee, or other fiduciary, (ii) as a director, officer, employee, member, partner or in another similar capacity for any corporation, partnership, limited liability company or other business entity, (iii) in any political or governmental office, whether or not elected or (iv) in any similar capacity, in each case without the prior written approval of the CEO with the approval of the Managing Directors. Each Principal shall deliver to the Firm all fees, salaries, remuneration and other compensation received by him or her for services rendered in any of the above described capacities and also teaching, speaking and

writing fees, honoraria and other payments, whether or not related to the practice of law, unless otherwise approved in writing by the CEO with the approval of the Managing Directors. []

\* \* \*

      2.29 <u>Voluntary and Involuntary Withdrawal of a Principal</u>. A Principal may voluntarily withdraw from the Firm at any time and shall withdraw involuntarily in the event two-thirds (2/3) of the persons who are then Senior Principals vote in favor of such withdrawal, as provided in section 2.8 hereof. A Principal shall be deemed to have voluntarily withdrawn from the Firm upon such Principal's death. Subject to applicable law, any Principal who in any fiscal year of the Firm, withdraws voluntarily or involuntarily shall be entitled to receive an amount equal to his or her proportionate share of the Firm's net income or proportionate amount of fixed dollar compensation for that portion of such fiscal year which concludes with the date of withdrawal. []

The Operating Agreement further provides:

      3.6    <u>Alternative Dispute Resolution: Mandatory Arbitration</u>. Any dispute, controversy or claim (hereinafter "Dispute") between the Firm or the Partnership and any current or former Principal or Principals of the Firm or current or former partner or partners of the Partnership (collectively referred to as the "Parties") of any kind or nature whatsoever (including, without limitation, any dispute controversy or claim regarding step placement, or compensation, or payment or non-payment of any bonus, the amount or change in amount of any bonus) shall be solely and conclusively resolved according to the following procedure:

      (a)    In the event of a Dispute, the Parties agree to first try in good faith to settle the dispute directly. If the parties are unable to resolve the dispute, they shall submit the dispute to third party neutral facilitation in accordance with the mediation rules of the American Arbitration Association ("Mediation"). If the Dispute is not resolved by a signed Settlement Agreement within ninety (90) days of a written request for Mediation given to one Party by the other identifying the Dispute, the Dispute shall be settled by binding arbitration ("Arbitration") in accordance with the internal laws of the State of Michigan. The Arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association except as specifically provided herein. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. There shall be three (3) arbitrators; one of whom shall be appointed by the Firm, one by the Principal(s) and/or partner(s) (as applicable) and the third of whom shall be appointed by the first two arbitrators. The hearing shall be held in the Detroit metropolitan area.

*iii. Procedural History*

Plaintiff filed his original complaint on June 13, 2012, and his amended complaint 13 days later. Plaintiff alleged the following six claims: breach of fiduciary duty (Count I), illegal shareholder oppression contrary to MCL 450.4515 (Count II), conversion (Count III), bad faith misrepresentation (Count IV), tortious interference with a business relationship or expectancy (Count V), and civil conspiracy (Count VI).

On July 13, 2012, in lieu of answering the complaint, defendants filed a motion for summary disposition and a motion to compel arbitration. Defendants argued that plaintiff voluntarily withdrew from the firm "[b]y switching careers and accepting other employment." Defendants asserted that plaintiff's claims fell within the ambit of the Operating Agreement's mandatory arbitration clause (§3.6) and therefore the court was compelled to dismiss the complaint. Defendants argued that the following language from §3.6 required the parties to submit to arbitration:

> Any dispute . . . between the Firm . . . and any . . . former Principal . . . of any kind or nature whatsoever . . . shall be solely . . . resolved according to the following procedure . . . [arbitration].

Defendants argued:

> The arbitration provision is written in expansive terms. It obligated and obligates [plaintiff] to arbitrate any and every dispute relating to his former position at the Firm. Not just some of those disputes, but all of them. It could not be drafted in broader language.

Defendants further argued that "[f]or purposes of this submission, it matters not one wit that [plaintiff] has limited his claims in this suit to claims against decision makers in the Firm rather than the firm itself."

In contrast, plaintiff argued that he could pursue claims against defendants individually because Michigan law provides that corporate employees and officials may be held personally liable for their own tortious acts even if acting on behalf of a company. Plaintiff further argued that the central issue in the case involved ultra vires conduct, and asserted that the nature of his claims showed that his suit was not against the Firm, but rather against defendants individually.

The circuit court found that the dispute did not fall within the scope of the arbitration clause, reasoning:

> The language of the arbitration clause in the Operating Agreement is crystal clear. It provides that disputes "between the Firm . . . and any current or former principal or principals of the Firm . . ." must be submitted to arbitration. It does not even mention disputes between current or former principals.
>
> * * *
>
> This point is further reinforced by the arbitrator selection procedure set forth within the arbitration clause. Specifically, the clause provides that the arbitration shall be conducted by three arbitrators, "one of whom shall be

appointed by the Firm, one by the Principal(s) . . . and the third of whom shall be appointed by the first two arbitrators." In a dispute solely between current or former principals, the Firm would not be a party, yet the only provision governing arbitrator selection requires the Firm in all instances to select one of the arbitrators. Thus clearly the arbitration clause was intended only to apply to disputes between a principal or principles [sic] and the firm itself. [Footnote omitted.]

The circuit court went on to state that other sections of the Operating Agreement reinforced that point because the provisions "repeatedly differentiate between the firm and the principals."

Referencing three forms developed by Miller Canfield that plaintiff attached to his response to defendants' motion, the circuit court stated:

Moreover, the firm itself has drafted professional practice forms that instruct attorneys within the firm that in drafting legal documents they must distinguish between a company as an entity and the directors, officers, and members of the company. Thus, any claim that use of the term "the Firm" in the Operating Agreement includes present or former principals acting within their official capacity, is simply incorrect. [Footnote omitted.]

After concluding that there was no presumption of arbitrability under MCR 3.602 and that the present case did not fall within the ambit of the Michigan Arbitration Act (MAA), MCL 600.5001 *et seq*[2], the circuit court concluded as follows:

Moreover, Defendants' argument that this dispute is actually between the Plaintiff and the firm, rather than between present or former Principals, is equally misguided. Plaintiff explicitly asserted his claims against the various Principals in their individual capacity, and seeks to hold the Defendants personally liable for their actions. Michigan law provides that corporate employees and officials can be held personally liable for all tortious acts in which they participate, regardless of whether they were acting on their own behalf or on behalf of the company.

Based on the above, the Court finds that the dispute in this case falls outside the scope of the arbitration agreement, and therefore denies Defendants' motion for summary disposition. [Footnote omitted.]

After rejecting defendants' arguments concerning arbitration, the circuit court granted partial summary disposition to plaintiff on his claims for shareholder oppression, conversion, and

---

[2] After the circuit court's order, effective July 1, 2013, the Michigan Arbitration Act (MAA), MCL 600.5001 *et seq*, was repealed and replaced by the Uniform Arbitration Act (UAA), MCL 691.1681, *et seq*. See 2012 PA 370; 2012 PA 371. However, the legislative change has no bearing on the resolution of the issues presented in this case.

tortious interference with a business expectancy. At the outset of its analysis, the circuit court reasoned that MCL 450.4509(1) required an LLC to set forth in its operating agreement the manner by which a member may voluntarily withdraw and concluded that plaintiff had not voluntarily withdrawn under the terms of the Operating Agreement. It also concluded that plaintiff did not withdraw involuntarily because the required two-thirds vote was not held. The circuit court then concluded that defendants acted without authority by depriving plaintiff of his ownership interest in the firm. Based on this conclusion, the circuit court found that termination of plaintiff's ownership substantially interfered with his interest as a member and that he was entitled to summary disposition on his shareholder oppression claim. Further, because it found that defendants terminated plaintiff's ownership interest without authority, the circuit court found that plaintiff was entitled to summary disposition on his conversion claim. Finally, the circuit court found that the improper termination of plaintiff's ownership interest tortiously interfered with his business relationship with Miller Canfield, other principals, and his clients.

This Court granted defendants' application for leave to appeal the circuit court's order.

## II. STANDARD OF REVIEW

Defendants contend that the circuit court erred in denying their motion to compel arbitration and in granting plaintiff partial summary disposition.

We review de novo a circuit court's determination regarding whether an issue is subject to arbitration. *In re Nestorovski Estate*, 283 Mich App 177, 184; 769 NW2d 720 (2009). "This Court reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). The circuit court granted partial summary disposition pursuant to MCR 2.116(C)(10). "In reviewing a motion brought under MCR 2.116(C)(10), we review the evidence submitted by the parties in a light most favorable to the nonmoving party to determine whether there is a genuine issue regarding any material fact." *Cuddington v United Health Services, Inc*, 298 Mich App 264, 271; 826 NW2d 519 (2012). "A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ." *Bennett v Detroit Police Chief*, 274 Mich App 307, 317; 732 NW2d 164 (2006). This case requires that we construe and apply the relevant statutes; issues of statutory construction involve questions of law that are also reviewed de novo. *Cuddington*, 298 Mich App at 271.

## III. ANALYSIS

### *i. Arbitrability*

On appeal, defendants first argue that the circuit court erred in denying their motion to compel arbitration because, according to defendants, plaintiff attempted to make an "end run" around the arbitration process by filing suit against defendants individually rather than against the business entity, i.e., the firm.

This Court has previously set forth the basic standards to determine whether a party is compelled to seek arbitration as follows:

The existence of an arbitration agreement and the enforceability of its terms are judicial questions for the court, not the arbitrators. The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To ascertain the arbitrability of an issue, [a] court must consider whether there is an arbitration provision in the parties' contract, whether the disputed issue is arguably within the arbitration clause, and whether the dispute is expressly exempt from arbitration by the terms of the contract. The court should resolve all conflicts in favor of arbitration. However, a court should not interpret a contract's language beyond determining whether arbitration applies and should not allow the parties to divide their disputes between the court and an arbitrator. [*Fromm v MEEMIC Ins. Co*, 264 Mich App 302, 305-306; 690 NW2d 528 (2004) (quotation marks and internal citations omitted).]

Defendants contend that *Rooyakker & Sitz v Plante & Moran, PLLC*, 276 Mich App 146; 742 NW2d 409 (2007), is dispositive of the issue of whether this matter is subject to arbitration. In *Rooyakker*, the individual plaintiffs, Mathew D. Rooyakker, George M. Sitz, and Sandra K. Burns, were employed by the defendant Plante & Moran, an accounting and business consulting firm. *Id*. at 148. As a condition of employment, the individual plaintiffs signed an agreement with Plante & Moran that contained "client solicitation" and an "arbitration clause." *Id*. The client solicitation clause provided in pertinent part as follows:

During the staff member's employment and during the two year period thereafter the staff member shall not, directly or indirectly, render professional accounting, tax, consulting or any other service provided by the Firm at the date of termination (whether voluntary or involuntary), other than as a bona fide, full-time employee of a client, to any Firm client. [*Id*. at 148-149.]

The arbitration clause provided in pertinent part,

At the option of the Firm, any dispute or controversy arising out of or relating to this Agreement, may be settled by arbitration held in Oakland County, Michigan, following the rules then in effect of the American Arbitration Association. [*Id*. at 149.]

The individual plaintiffs worked at Plante & Moran's Gaylord office. *Id*. at 148. When that office closed, the individual plaintiffs declined to relocate to another office and instead commenced working for the plaintiff Rooyakker & Sitz, PLLC. *Id*. at 150. Shortly thereafter, Plante & Moran initiated arbitration proceedings against the plaintiffs individually, alleging that the individual plaintiffs violated the client solicitation clause. *Id*. The plaintiffs then commenced suit, alleging, *inter alia*, that the agreement was unenforceable and alleging that the individual defendants Kevin Lang and Michelle Carroll interfered with business expectations and defamed the plaintiff Rooyakker & Sitz, PLLC. *Id*. Ultimately, the trial court held that the parties were bound by the arbitration clause and granted summary disposition in favor of the defendants. *Id*. at 151-152.

The plaintiffs appealed, arguing in part that the trial court erred in ordering the plaintiff Rooyakker & Sitz, PLLC, and the individual defendants Lang and Carroll to submit to arbitration

when those parties were not signatories to the original agreement containing the arbitration clause. *Id*. at 162. This Court rejected the plaintiff's argument, reasoning as follows:

> [T]he broad language of the arbitration clause —"*any dispute or controversy arising out of or relating to*" the agreement—vests the arbitrator with the authority to hear plaintiffs' . . . claims, even if they involve nonparties to the agreement. Further, Michigan courts clearly favor keeping all issues in a single forum . . . . Therefore, we do not believe that the trial court erred in referring plaintiffs' . . . claims to arbitration because they arise out of or relate to the individual plaintiffs' past employment with Plante & Moran. [*Id*. at 163-164 (citations omitted, emphasis added).]

We disagree with defendants' assertion that *Rooyakker* is directly on point. The central question in this case does not involve whether plaintiff should be allowed to sever his claims into arbitrable and nonarbitrable categories. Rather the central question presented in this case is whether plaintiff can sue the firm managers as individuals, or whether plaintiff is required to arbitrate his claims against them. That question was not at issue in *Rooyakker*. Thus, we turn to the language of the operating agreement to discern whether the operating agreement mandates arbitration of plaintiff's claims.

Like the arbitration clause at issue in the present case, the arbitration clause in *Rooyakker*, 276 Mich App at 149, did reference "[a]ny dispute or controversy," and it is that language on which defendants heavily rely for their argument on this issue. However, in *Rooyakker*, the full phrase was "[a]t the option of the Firm, any dispute or controversy *arising out of or relating to this Agreement*, may be settled by arbitration. . . ." *Rooyakker*, 276 Mich App at 149 (emphasis added). However, in the present case, the precise language is as follows:

> Any dispute, controversy or claim (hereinafter "Dispute'') *between the Firm or the Partnership and any current or former Principal or Principals* of the Firm or current or former partner or partners of the Partnership of any kind or nature whatsoever . . . shall be solely and conclusively resolved according to the following procedure." [Emphasis added.]

Abbreviated and emphasized to be pertinent to the present case, it is "Any dispute, controversy or claim . . . *between the Firm . . . and any current or former Principal* of any kind or nature whatsoever . . . shall be solely and conclusively resolved according to the [ADR] procedure." Thus, the arbitration provision in *Rooyakker* is not the same as, or even analogous to, that in the present case. The arbitration clause in this case is more restrictive in that it limits its scope to disputes between the Firm and a principal.

In the present case, there is clearly an arbitration provision in the Operating Agreement. The question is whether it applies between these particular parties, which, by legal necessity, implicates the next question: "whether the disputed issue is arguably within the arbitration clause."

> In interpreting a contract, it is a court's obligation to determine the intent of the parties by examining the language of the contract according to its plain and

ordinary meaning. If the contractual language is unambiguous, courts must interpret and enforce the contract as written because an unambiguous contract reflects the parties' intent as a matter of law. [*In re Egbert R. Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008) (citations omitted).]

As the circuit court found, the plain language of the arbitration provision in this case clearly and unambiguously contemplates arbitration of disputes between "the Firm" and "a Principal." There is no language contained in the operating agreement from which this Court could infer that the arbitration provision contemplated disputes between principals, i.e., between plaintiff and the Firm managers he has sued. We also cannot find that the language of the provision is ambiguous relative to this point. Indeed, as the circuit court observed, the provision "does not even mention disputes between current or former principals." And, as the circuit court also noted, there are other provisions in the operating agreement that clearly distinguish between the Firm and its principals. For example, the arbitrator selection procedure calls for the arbitration to be conducted by three arbitrators, "one of whom shall be appointed by the Firm, one by the Principal(s) . . . and the third of whom shall be appointed by the first two arbitrators." As the circuit court observed, "In a dispute solely between current or former principals, the Firm would not be a party, yet the only provision governing arbitrator selection requires the Firm in all instances to select one of the arbitrators." In *Rooyakker*, this Court stated that when interpreting arbitration clauses, "[t]he court should resolve all conflicts in favor of arbitration." *Rooyakker*, 276 Mich App at 163. However, because of the clear and unambiguous language restricting the arbitration requirement to disputes between "the Firm" and "a Principal," there is no conflict requiring resolution.

Defendants additionally rely on *Hall v Stark Reagan*, *PC*, 294 Mich App 88; 818 NW2d 367 (2011), reversed in part, 493 Mich 903 (2011), in which this Court considered the arbitrability of the plaintiffs' age discrimination claims. This Court found that those claims did not come within the following language in the arbitration agreement at issue: "'Any dispute regarding interpretation or enforcement of any of the parties' rights or obligations hereunder . . .'", reasoning that "[t]he 'rights or obligations' delineated in the contract bear no relationship to [the plaintiff's] age-discrimination claims." *Id.* at 94, 98 (footnote omitted). Our Supreme Court reversed in an order on the following grounds:

> The dispute in this case concerns the motives of the defendant shareholders in invoking the separation provisions of the Shareholders' Agreement . . . with respect to the plaintiffs. This is a "dispute regarding interpretation or enforcement of . . . the parties' rights or obligations" under the Shareholders' Agreement, and is therefore subject to binding arbitration pursuant to . . . the Agreement. [*Hall v Stark Reagan, PC*, 493 Mich 903; 823 NW2d 274 (2011).]

Defendants contend that the circuit court erred when it relied on this Court's now "defunct" decision in *Hall*, 294 Mich App at 88, to find that §3.6 did not extend to plaintiff's dispute with the individual principals of the Firm. However, to state that the circuit court "relied" on *Hall* is to overstate the circuit court's ruling relative to *Hall*. The circuit court cited *Hall*, and used it in the following manner:

[A] party may not be compelled to arbitration without his consent, and courts may not "use policy considerations as a substitute for party agreement." Moreover, a Court must not extend the reach of an arbitration agreement through implication, especially where it is an agreement between attorneys with expertise in arbitration. [Internal citations omitted.]

We glean from this portion of the circuit court's ruling that the proposition for which the circuit court cited *Hall* was essentially that "by their chosen words, the contracting parties determined the scope of their arbitration agreement," which is also unremarkable and unassailable. As this Court and our Supreme Court have observed, that is a "bedrock principle" in contract law. See generally, *Bayati v Bayati*, 264 Mich App 595, 599; 691 NW2d 812 (2004); *In re Egbert R. Smith Trust*, 480 Mich at 24. Hence, the manner in which the circuit court relied on this Court's ruling in *Hall* does not call into question its conclusion that the shareholder oppression, conversion and tortious interference claims did not come within the arbitration provision in the present case. Moreover, the language in the arbitration clause at issue in *Hall*, like the clause in *Rooyakker*, is addressed to which types of claims are subject to arbitration, not to whom the disputes must be between in order to require arbitration, and that is the central question in this case.

In reaching its conclusions on this issue, the circuit court rejected defendants' arguments that this dispute is really between plaintiff and the Firm, not between plaintiff and present or former principals. The circuit court noted that plaintiff's claims were asserted against defendants in their individual capacity and sought to hold them personally liable for their actions. Indeed, plaintiff's essential claim is that defendants took his ownership interest in contravention of the Firm's own stated exclusive method for doing so—by two-thirds vote of the senior principals. "It is well established that corporate employees and officials are personally liable for all tortious and criminal acts in which they participate, regardless of whether they are acting on their own behalf or on behalf of a corporation." *Joy Mgt Co v Detroit*, 183 Mich App 334, 340; 455 NW2d 55 (1990).

We therefore concur with the circuit court that the dispute between plaintiff and the named individual defendants is not even "arguably within the arbitration clause." The circuit court therefore did not err in denying defendant's motion for summary disposition.

*ii. Partial Summary-Disposition*

Defendants next argue that the circuit court erred in granting plaintiff's motion for partial summary disposition with respect to the shareholder oppression, conversion and tortious interference with a business expectancy claims. Defendants contend that there was a genuine issue of material fact and cite affidavits they submitted with their response to plaintiff's motion. Defendants contend that the circuit court "elected to disregard the Defendants' opposing affidavits that contested all of the material facts on which Altobelli relied in making his claims."

The circuit court's grant of partial summary disposition was based on its interpretation of MCL 450.4509(1), a subsection of the LLCA governing a member's withdrawal from a limited liability company. Before discussing the circuit court's interpretation of this statute, a brief overview of the statutory history of this provision is useful.

MCL 450.4509(1) provides in pertinent part: "A member may withdraw from a limited liability company only as provided in an operating agreement." This statute was amended by 1997 PA 52. Prior to that amendment, the statute provided in pertinent part:

A member may withdraw from a limited liability company as provided in an operating agreement or by giving written notice to the company and to the other members at least 90 days in advance of the date of withdrawal. . . . [See 1993 PA 23.]

Thus, the statute before the amendment allowed withdrawal in two situations: first, withdrawal was proper "as provided in an operating agreement," and second, it created a statutory withdrawal mechanism requiring 90 days written notice. The 1997 amendment removed the statutory withdrawal mechanism and provided that withdrawal from an LLC was proper "only as provided in the operating agreement." MCL 450.4509(1).

The circuit court reasoned that the revised language of MCL 450.4509(1) "requires an LLC to set forth in its operating agreement the method by which a member may withdraw." The court reasoned as follows:

A review of the history of the statute establishes that the 'only as provided' language in section (1) explicitly refers to methods of withdrawal. Prior to 1997 [MCL 450.4509(1)] provided that a member could withdraw "ONLY as provided . . . in an operating agreement, or by giving written notice to the company and to the other members at least 90 days in advance of the date of withdrawal . . . ."

Since 1997 the statute has provided that a member wishing to withdraw from an LLC must strictly comply with the requirements for withdrawal set forth in the LLC's operating agreement, or his withdrawal is ineffective.

* * *

Thus, Plaintiff is correct that the statute requires an LLC to set forth in its operating agreement the method by which a member may withdraw.

After concluding that MCL 450.4509(1) required an LLC to set forth the methods by which a member may voluntarily withdraw, the circuit court proceeded to hold that the Operating Agreement did not provide a means for individual principal members to voluntarily withdraw from Miller Canfield. The circuit court reasoned as follows:

The Miller Canfield operating agreement provides that a principal has the right to voluntarily withdraw from the firm, but the only method provided for in the operating agreement applies only to a principal who becomes an employee of a professional corporation. No method of voluntarily withdrawal is provided for an individual principal. As a result, in essence the Miller Canfield operating agreement does not permit an individual to voluntarily withdraw from the firm, because it does not provide the method that must be complied with in order for such a voluntary withdrawal to occur. Moreover, because no method has been

-12-

provided, Plaintiff cannot be deemed to have voluntarily waived his ownership rights in the firm.

Having concluded that the Operating Agreement did not provide a means for plaintiff to withdraw from the Firm, the court proceeded to grant partial summary disposition in favor of plaintiff with respect to Counts II, III and V, because, according to the circuit court, these claims were "premised on the underlying assertion that Plaintiff did not voluntarily withdraw from the firm; that no events constituting an automatic withdrawal occurred; and that no involuntary withdrawal in conformity with the operating agreement occurred." The circuit court stated, "No method was set forth here, and therefore there was no method with which Plaintiff could comply. Under these circumstances, the Court finds that there is no genuine issue of material fact that Plaintiff did not voluntarily withdraw from Miller Canfield."

Defendants argue that the circuit court erred in concluding that the Operating Agreement did not provide a means for an individual principal to voluntarily withdraw. Specifically, defendants cite §2.29 of the Operating Agreement, which provides that "[a] Principal may voluntarily withdraw from the Firm at any time . . . ." Defendants also note that other language in §2.29 mentions "voluntary withdrawal" several times, including language that states, "[a] Principal shall be deemed to have voluntarily withdrawn from the Firm upon such Principals' death," and in other parts stating how voluntary withdrawal affects distribution and compensation.

We find that the circuit court's interpretation of MCL 450.4509(1) and of the Operating Agreement is legally incorrect. The statute provides that "A member may withdraw from a limited liability company *only as provided in an operating agreement*" (emphasis added). The circuit court interpreted the statutory language "only as provided in an operating agreement" to mean that the operating agreement must provide a specific method or procedure for voluntary withdrawal. Absent specified means and procedures, the court reasoned, there can be no voluntary withdrawal.

Contrary to the trial court's interpretation, the 1997 statutory amendment's removal of a member's ability to withdraw through written notice does not compel the conclusion that there can be no voluntary withdrawal where an LLC's operating agreement does not provide a specified procedure for withdrawal. Such a conclusion has no basis in the plain language of the statute. Reviewing the relevant statutory language, we glean no verbiage to cause this Court to conclude that an LLC's operating agreement cannot permit voluntary withdrawal without delineating any conditions precedent in its operating agreement. To require such conditions or procedural steps forces an LLC to insert something into its operating agreement that perhaps none of its members may find desirous. Consequently, we read the "only as provided" language to mean that a member can no longer withdraw unless an operating agreement permits withdrawal. We therefore conclude that the circuit court erred in its interpretation and application of MCL 450.4509(1), and thus, erred in its conclusion that plaintiff could not have voluntarily withdrawn from the Firm.

Because the circuit court concluded that the Operating Agreement did not permit plaintiff to voluntarily withdraw, it rejected defendants' argument that whether plaintiff voluntarily withdrew should be analyzed by applying the facts to the dictionary definition of "voluntary."

"Courts may consult dictionary definitions to ascertain the plain and ordinary meaning of terms undefined in an agreement." *Holland v Trinity Health Care Corp*, 287 Mich App 524, 527-528; 791 NW2d 724 (2010). The Operating Agreement contains three references to circumstances that constitute voluntary withdrawal, but does not further define the term. Specifically, §2.29 provides that, "[a] Principal may voluntarily withdraw from the firm at any time . . . . A Principal shall be deemed to have voluntarily withdrawn from the Firm upon such Principal's death." In addition, §2.34 provides in pertinent part:

> (b) Any individual who was a Principal in the Firm and who becomes an employee of such professional corporation shall no longer be a Principal in the Firm for any purpose whatsoever . . . and such individual shall be deemed to have voluntarily withdrawn as a Principal in the Firm.

> (c) Any Principal which is a professional corporation may elect by advance written notice . . . to withdraw from the firm.

Although the circumstances set forth in these provisions constitute a "voluntary withdrawal," the Operating Agreement does not contain any language indicating that these are the *only* circumstances in which a principal may withdraw from the Firm. At the least, the juxtaposition of "*[a] Principal may voluntarily withdraw from the firm at any time*" with the three specified circumstances set forth above makes the agreement ambiguous on that point. We therefore turn to the dictionary to clarify the definition of the term "voluntary."

*Random House Webster's Collegiate Dictionary* (2001) defines "voluntary" in relevant part as "done, made, brought about, or undertaken of one's own accord of by free choice" and "acting or done without compulsion or obligation." Thus, in the context of the Operating Agreement, "voluntary" can reasonably be construed to include actions taken by an individual of his or her own accord, by free choice, without compulsion or obligation.

In this case, defendants submitted two affidavits to support that there was a genuine issue of material fact regarding whether plaintiff voluntarily withdrew from the Firm. In one of the affidavits, Hartmann averred as follows:

> The factual assertion underlying Plaintiff's Motion for Partial Summary Disposition is that the defendants ousted him from the Firm and terminated his ownership interest. That assertion is simply untrue. Dean Altobelli left the Firm to take another job.

Hartmann averred that, "[o]ne time honored way for principals to withdraw from the Firm is to simply take another job. Over the years, a number of principals have withdrawn from the Firm by taking another job." Hartmann asserted that plaintiff voluntarily withdrew from the firm when he vacated his office, stopped coming to work, took another job and accepted compensation and benefits from another employer. Hartmann stated that, "[plaintiff] was not ousted from the Firm. This was not a termination or an involuntary withdrawal requiring a two-thirds vote of the Senior Principals." Hartmann further stated that under the Operating Agreement, the managers had to approve any outside employment, and the managers decided not

-14-

to approve plaintiff's request to work at the University of Alabama. Hartmann asserted that, "[n]o vote or input from the other Principal or owners was required."

In addition, Hartmann referenced §2.17 of the Operating Agreement, which in pertinent part provides:

> Each principal shall devote his or her full time and best efforts to the success of the Firm except as otherwise approved in writing by the CEO with approval of the Managing Directors . . . no Principal may serve as an . . . employee . . . or in another similar capacity for any corporation, partnership, limited liability company or other business entity . . . without the prior written approval of the CEO with the approval of the Managing Directors.

Hartmann stated that plaintiff was aware that written approval was required before he could work full-time for another entity, yet nevertheless left for the University of Alabama.

Hartmann also quoted the following from a July 7, 2010, e-mail that plaintiff sent him and others from which it could be reasonably inferred that plaintiff understood that if the managers did not approve his working at the University of Alabama, his departure for the university would constitute withdrawal from the firm:

> I want to discuss my status with the firm, my compensation and client matters and come to an agreement with the firm. As far as status, I have asked Mike Hartmann to seek approval from the managers under section 2.17 of the operating agreement to approve my outside compensation from the University of Alabama. If approved, I expect that my status and compensation as a senior principal at the firm will not change for the next 6 plus months . . . . Alternatively, I think it is only fair that if I withdraw from the firm and continue to work on a transition of client business, we should come to an agreement on my 2010 compensation . . . .

Furthermore, although plaintiff asked for a 7-12 month leave of absence, in that request, plaintiff stated, "Dean Altobelli may return to Miller Canfield as a senior principal at any time before June 1, 2011." Hartmann asserted that the language in this request "makes it clear that [plaintiff] knew all along that he could not continue as a Principal at Miller Canfield while holding another job. Indeed his own proposal seeks to allow him to return to Miller Canfield as a Principal."

Hartmann denied that plaintiff described the opportunity at Alabama as a temporary career enhancement. Hartmann averred that, "[plaintiff] told me that he had taken a full time job that he hoped would lead to greater coaching opportunities for him." Hartmann also noted that on January 24, 2011, plaintiff submitted a proposal indicating that he would continue to work at the University of Alabama but was interested in becoming "of counsel" at the Firm, and that under the heading "Return to Principal Status," plaintiff proposed that "Dean's principal status will be reinstated in 2011." Hartmann proceeded to explain that,

> By the time of the exchange of emails in early July 2010, [plaintiff] had, as a practical matter, already left the firm. He had already asked other lawyers in

the Firm, including LeRoy Asher, to take over clients he had been servicing and cases he was handling, and had already transitioned clients and case files to Mr. Asher and others.

Hartmann also stated,

> [Plaintiff] asked for my opinion about whether he could come back to the Firm someday in the future if his coaching career did not work out; I told him that, in my opinion, I thought that he probably could. He and I both knew that I was not in a position to make any commitment that the firm would take him back in the future if he wanted to return, as I did not have the authority to make such a commitment.

Finally, Hartmann averred as follows:

> Upon information and belief, [plaintiff] is now in his third year of employment with the University of Alabama football program. I have reviewed the website for the 2012 University of Alabama football program and have seen that [plaintiff] is identified as being on the staff of the football program as a "Defensive Analyst." []

In the other affidavit, LeRoy Asher, Jr., averred, in part, that plaintiff "asked whether, if he returned to the Firm in the future, I would return the mortgage servicing client to him."

Viewed in a light most favorable to defendants, we find the above-cited affidavits leave open a genuine issue of material fact regarding whether plaintiff voluntarily withdrew from the firm—i.e. whether plaintiff left the Firm of his own accord and by his own free choice without compulsion or obligation. In the event that he did, there would have been no need for a vote of the senior principals to expel him. The circuit court's determination that the vote was required, the lack of that vote, and the declaration in MCL 450.4504(1) that membership interest in an LLC is personal property, were the basis on which the circuit court granted partial summary disposition on the shareholder oppression, conversion and tortious interference with a business expectancy claims. Because there was a genuine issue of material fact regarding whether plaintiff voluntarily left the firm, summary disposition was inappropriate. *Cuddington*, 298 Mich App at 270; MCR 2.116(C)(10).

## IV. CONCLUSIONS

The trial court did not err in denying defendants' motion to compel arbitration because the claims asserted by plaintiff in this case do not fall within the arbitration clause contained in Miller Canfield's Operating Agreement. However, there remains a genuine issue of material fact as to whether plaintiff voluntarily withdrew from the Firm and the trial court erred in granting plaintiff's motion for partial summary disposition.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Neither party having prevailed in full, neither may tax costs. MCR 7.219(A). Jurisdiction is not retained.

/s/ Stephen L. Borrello
/s/ Deborah A. Servitto
/s/ Jane M. Beckering