# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

ALTOBELLI v HARTMANN

Docket No. 150656. Argued on application for leave to appeal March 9, 2016. Decided June 13, 2016.

Dean Altobelli filed a complaint in the Ingham Circuit Court against seven individual principals of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. (the Firm)—five managing directors, the Firm's CEO, and the head of the Firm's litigation group. Altobelli did not name the Firm as a defendant. Altobelli himself was a senior principal of the Firm at the time the events from which this lawsuit arose took place. All principals of the Firm were required to sign an Operating Agreement that contained information concerning principals' rights and obligations and the administration of the Firm's business. The Operating Agreement also contained an arbitration clause that mandated arbitration of "any dispute . . . between the Firm . . . and any current or former Principal[.]" In 2010, Altobelli informed two of the defendants—the Firm's CEO, and the head of the Firm's litigation group—that he wished to take a leave of absence from the Firm so that he could pursue an opportunity to join the coaching staff of the University of Alabama football team. Altobelli suggested that the Firm allow him to maintain his ownership interest in the Firm and to return to the Firm as a senior principal any time before June 1, 2011. Although Altobelli claimed he was initially promised he could take the job in Alabama and still receive certain allocated funds from his clients, defendants claimed that Altobelli knew that the individual making that alleged promise had no authority to make a formal commitment to Altobelli. Believing that Altobelli had accepted the position at the University of Alabama, the CEO and the managing directors concluded that Altobelli had voluntarily withdrawn from the Firm. Altobelli argued that he did not voluntarily withdraw, but that he was improperly terminated. Altobelli's attempt to resolve the matter through the direct settlement and mediation process, as outlined in the arbitration clause of the Operating Agreement, was unsuccessful. In November 2011, Altobelli filed a demand for arbitration as provided for in the arbitration clause. Despite having made the demand for arbitration, Altobelli filed the instant lawsuit alleging that the seven individuals named as defendants were responsible for engaging in tortious conduct with regard to Altobelli's request for a leave of absence and retention of his equity ownership in the Firm. Defendants filed a motion for summary disposition and a motion to compel arbitration as required by the arbitration clause. Altobelli filed a motion for partial summary disposition. The circuit court, Paula J. Manderfield, J., denied defendants' motions and granted Altobelli's motion for partial summary disposition, finding as a matter of law that Altobelli did not voluntarily withdraw from the Firm. Rather, the circuit court concluded that defendants had improperly terminated Altobelli's ownership interest without

authority.  Defendants appealed in the Court of Appeals.  The Court of Appeals, BORELLO, P.J., and SERVITTO and BECKERING, JJ., affirmed the circuit court's denial of defendants' motion to compel arbitration and reversed the circuit court's order granting partial summary disposition to Altobelli.  307 Mich App 612 (2014).  The Court of Appeals determined that the central question was whether Altobelli could sue the Firm's managing directors, CEO, and head of the litigation group in their individual capacities or whether the arbitration clause required arbitration of the dispute.  The Court of Appeals decided that the arbitration clause only required the arbitration of disputes between the Firm and a current or former principal, not disputes between a former principal and individually named defendants.  The Court of Appeals concluded that there existed a question of fact about whether Altobelli voluntarily withdrew from the Firm.  Defendants appealed, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action.  498 Mich 912 (2015).

In a unanimous opinion by Justice BERNSTEIN, the Supreme Court *held*:

The Operating Agreement's mandatory arbitration clause is not limited to disputes between the Firm and current or former principals of the Firm.  The clause also applies to a dispute between a former principal and individually named principals of the Firm acting as agents of the Firm.  Because the Operating Agreement's arbitration clause applies to this case, the lower courts erred by reaching the substantive content of Altobelli's motion for partial summary disposition.   The arbitrators chosen according to the procedure outlined in the arbitration clause are responsible for resolving the issues raised in Altobelli's motion.

1.  A court reviewing the disposition of a party's motion to compel arbitration must avoid analyzing the substantive merits of the dispute; if the dispute is arbitrable, the merits are to be analyzed by the arbitrator(s).  In this case, the lower courts should not have reached the issues raised in Altobelli's motion for partial summary disposition because the arbitration clause mandated binding arbitration for disputes arising between a current or former principal of the Firm and the Firm, which includes individual principals of the Firm acting as agents of the Firm.

2.  In interpreting an arbitration clause, the agency principles that apply to corporations also apply to professional limited liability companies.  The operation of a professional limited liability company depends on the actions of its employees who have been given the authority to act as the company's agents.  The actions of these employees, when the employees are operating on behalf of the company, are the acts of the company.  Because a company cannot act on its own, an arbitration clause that includes a company as a party to arbitration must also include those employees that act as agents of the company.

3.   An arbitration clause intended to cover any dispute between a current or former principal and a company is broad in scope but applies only when the subject matter of the dispute involves actions taken by a principal acting on behalf of the company.  In this case, Altobelli alleges numerous occasions on which one or more of the defendants deprived Altobelli of his rights under the Operating Agreement.  All of Altobelli's allegations reflect decisions made by defendants in their capacities as the Firm's agents, as authorized by the Operating Agreement and agency principles.

Reversed in part and vacated in part; application for leave to appeal as cross-appellant denied as moot.

©2016 State of Michigan

# OPINION

Chief Justice:          Justices:
Robert P. Young, Jr.  Stephen J. Markman
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano
                        Richard H. Bernstein
                        Joan L. Larsen

FILED  June 13, 2016

S T A T E   O F   M I C H I G A N

SUPREME COURT

DEAN ALTOBELLI,

　　　　Plaintiff-Appellee/
　　　　Cross-Appellant,

v                                                    No. 150656

MICHAEL W. HARTMANN, MICHAEL
A. COAKLEY, M. ANNA MAIURI,
JOSEPH M. FAZIO, DOUGLAS M.
KILBOURNE, JOHN D. LESLIE and
JEROME R. WATSON,

　　　　Defendants-Appellants/
　　　　Cross-Appellees.

BEFORE THE ENTIRE BENCH

BERNSTEIN, J.

　　　　This case requires the Court to address whether plaintiff's tort claims against individual principals of a law firm fall within the scope of an arbitration clause that mandates arbitration for any dispute between the firm and a former principal. Generally speaking, a company may only act through its agents. In this case, plaintiff, a former

principal, challenges actions the individual defendants performed in their capacities as agents carrying out the business of the firm. Therefore, this is a dispute between the firm and a former principal that falls within the scope of the arbitration clause and is subject to binding arbitration.

Accordingly, we reverse that part of the Court of Appeals' opinion holding that this matter was not subject to arbitration. We vacate the remaining portion of the Court of Appeals' opinion, which relates to plaintiff's motion for partial summary disposition, and we remand this case to the trial court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

In 1993, plaintiff Dean Altobelli began working as an attorney for Miller, Canfield, Paddock and Stone, P.L.C. ("the Firm"), a professional limited liability company formed under the Michigan Limited Liability Company Act (MLLCA), MCL 450.4101 *et seq*. Upon joining the Firm, plaintiff signed the "Miller Canfield Operating Agreement" ("Operating Agreement"), a document governing the Firm's internal affairs. The Operating Agreement provides that members of the Firm are referred to as "principals." All principals sign the Operating Agreement. The introductory section of the Operating Agreement states that the document "by and between the [Principals] . . . evidences the following agreement between them[.]" In a subsequent section, the principals further acknowledge that the "covenants and agreements herein contained shall inure to the benefit of and be binding upon the parties hereto[.]"

2

The Operating Agreement delegates particular responsibilities and powers to certain individuals within the Firm. A principal must devote "his or her full time and best efforts to the success of the Firm except as otherwise approved in writing by the CEO with the approval of the Managing Directors." Principals may "voluntarily withdraw from the Firm at any time" and shall involuntarily withdraw in the event of a two-thirds vote of the senior principals. Senior principals are principals who have been granted equity ownership in the Firm. Five senior principals, called the "managing directors," are invested with "[s]ole, full and complete power and authority to manage . . . the Firm . . . ." Managing directors have the authority to designate a Chief Executive Officer ("CEO"), who has, "with binding effect on the Managing Directors, the power and authority of the Managing Directors with respect to the day-to-day administration of the business and affairs of the Firm."

The Operating Agreement also contains a mandatory arbitration agreement:

> 3.6 <u>Alternative Dispute Resolution: Mandatory Arbitration</u>. Any dispute, controversy or claim (hereinafter "Dispute") between the Firm or the Partnership and any current or former Principal or Principals of the Firm or current or former partner or partners of the Partnership (collectively referred to as the "Parties") of any kind or nature whatsoever (including, without limitation, any dispute[,] controversy or claim regarding step placement, or compensation, or the payment or non-payment of any bonus, the amount or change in amount of any bonus) shall be solely and conclusively resolved according to the following procedure:
>
> (a) In the event of a Dispute, the Parties agree to first try in good faith to settle the dispute directly. If the parties are unable to resolve the dispute, they shall submit the dispute to third party neutral facilitation in accordance with the mediation rules of the American Arbitration Association ("Mediation"). If the Dispute is not resolved by a signed Settlement Agreement within ninety (90) days of a written request for Mediation given to one Party by the other and identifying the Dispute, the Dispute shall be settled by binding arbitration ("Arbitration") in accordance

3

with the internal laws of the State of Michigan. The Arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association except as specifically provided herein. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. There shall be three (3) arbitrators; one of whom shall be appointed by the Firm, one by the Principal(s) and/or partner(s) (as applicable) and the third of whom shall be appointed by the first two arbitrators. The hearing shall be held in the Detroit metropolitan area. [Emphasis added.]

By January 2006, plaintiff had become a senior principal at the Firm.[1] However, in late May or early June 2010, plaintiff decided he wanted to pursue a new opportunity as an assistant coach for the University of Alabama football team. Plaintiff proposed a 7- to 12-month leave of absence from the Firm to defendant Michael Hartmann, the Firm's CEO, and defendant Michael Coakley, who was the head of the Firm's litigation group but was not a managing director. Plaintiff suggested that the Firm permit him to maintain his ownership interest and return to the Firm as a senior principal any time before June 1, 2011.

Plaintiff avers that Hartmann initially promised plaintiff that he could spend as much time at the University of Alabama as he wanted and still receive certain allocated income from his clients. Hartmann disputes this, claiming that although he told plaintiff that he could "probably" return to the Firm, plaintiff knew Hartmann had no authority to make a formal commitment. Plaintiff contends that, in reliance on Hartmann's assurance, he moved to finalize his agreement with the University of Alabama in June 2010. Plaintiff claims he also spent many hours preserving his clients and business for the Firm.

---

[1] Although plaintiff was a senior principal, he was not a managing director, and plaintiff does not allege that he had any further authority in the Firm.

Plaintiff alleges that Hartmann then withdrew his support, suddenly rejecting the proposed leave of absence and instead suggesting that plaintiff voluntarily withdraw from the Firm without any assurance that he would be reinstated. In response, on July 10, 2010, plaintiff sent an e-mail to the managing directors seeking approval of the job opportunity with the University of Alabama, and an exception to the section of the Operating Agreement obligating a principal to devote his or her full time to the Firm. Plaintiff claims he informed the managing directors that he had no plans to relinquish his principal status or compensation. On July 20, 2010, plaintiff submitted a statement to defendant Coakley detailing his past and projected contributions to the Firm. Plaintiff asserts that Hartmann informed plaintiff the next day that the managing directors had decided to terminate his equity ownership, effective July 31, 2010. In an e-mail response, plaintiff demanded a vote of the principals, asserting that the managing directors lacked the authority to terminate him under the Operating Agreement. On July 22, Hartmann replied: "I did not say the Firm had terminated your position. I told you that since you had voluntarily accepted a full time position at Alabama and had already started there, the Firm will consider you to have withdrawn from the partnership as of July 31, 2010." Plaintiff disputes this, contending that he did not voluntarily withdraw from the Firm, that he was improperly terminated, and that the Firm shorted plaintiff's 2010 income as a result.[2]

---

[2] While the parties dispute whether plaintiff voluntarily withdrew from the Firm in July 2010, it is undisputed that plaintiff eventually left the Firm, accepted a position at the University of Alabama, and is no longer a principal of the Firm.

5

Plaintiff initially sought resolution through the direct settlement and mediation process provided for in the Operating Agreement. In November 2011, when these efforts failed, plaintiff filed a demand for arbitration with the American Arbitration Association, as outlined in the Operating Agreement. Plaintiff's arbitration demand contested his last five years of compensation and the managing directors' decision to treat his departure as a relinquishment of his equity ownership status. Plaintiff alleged bad-faith discrimination in the allocation of income, bad-faith violations of the Operating Agreement, bad-faith misrepresentation, bad-faith conspiracy to improperly exclude him from the Firm, and shareholder oppression in violation of MCL 450.4515.

Despite having set the arbitration proceeding in motion, and while the parties were in the process of selecting arbitrators, plaintiff turned the tide by filing the instant case in the Ingham Circuit Court. Plaintiff did not name the Firm itself as a defendant in the suit. Instead, plaintiff named seven individual principals of the Firm: Hartmann, Coakley, and the five managing directors (collectively, "defendants").[3] In his circuit court complaint, plaintiff presented claims substantially similar to those he had alleged in arbitration, essentially repackaging them as tortious conduct: breach of fiduciary duty, illegal shareholder oppression contrary to MCL 450.4515, conversion, bad-faith misrepresentation, tortious interference with a business relationship or expectancy, and civil conspiracy.

In the circuit court, defendants filed a motion for summary disposition under MCR 2.116(C)(10), and a motion to compel arbitration under MCR 2.116(C)(7). In the

---

[3] As principals, each of these defendants had signed the Operating Agreement.

motion to compel arbitration, defendants argued that plaintiff's claims fell within the scope of the Operating Agreement's mandatory arbitration clause, and that the circuit court was therefore compelled to dismiss the complaint. Plaintiff countered with a motion for partial summary disposition with respect to his claims of shareholder oppression, conversion, and tortious interference with a business relationship or expectancy. The circuit court denied defendants' motions, concluding that the dispute did not fall within the ambit of the arbitration clause. The circuit court granted plaintiff's motion for partial summary disposition, finding as a matter of law that plaintiff did not voluntarily withdraw from the Firm under MCL 450.4509(1)[4] or the Operating Agreement, and that defendants had improperly terminated plaintiff's ownership interest without authority.

On appeal, the Court of Appeals affirmed the circuit court's denial of defendants' motion to compel arbitration, but reversed the circuit court's order granting plaintiff's motion for partial summary disposition. *Altobelli v Hartmann*, 307 Mich App 612, 640; 861 NW2d 913 (2014). With respect to the motion to compel arbitration, the Court of Appeals determined that the central question was whether plaintiff could sue the Firm's managers in their individual capacities or whether plaintiff was instead required to arbitrate his claims against them. *Id*. at 626. After examining the plain language of the arbitration clause, the Court of Appeals concluded that the provision only mandates arbitration of disputes between "the Firm" and "a Principal." *Id*. at 628. The Court of

---

[4] MCL 450.4509(1) provides in pertinent part: "A member may withdraw from a limited liability company only as provided in an operating agreement."

7

Appeals rejected defendants' argument that this was in essence a dispute between plaintiff and the Firm, noting that plaintiff's claims were asserted against defendants in their individual capacities and sought to hold them personally liable for their actions. *Id*. at 630-631. With respect to plaintiff's motion, the Court of Appeals found that MCL 450.4509(1) permits voluntary withdrawal if a firm's operating agreement allows for such withdrawal, even without specifying a particular method. *Id*. at 631-636. The Court of Appeals then found that a genuine issue of fact existed as to whether plaintiff voluntarily withdrew from the Firm, thus concluding that summary disposition was unwarranted. *Id*. at 636-640.

In this Court, defendants challenged the Court of Appeals' ruling on the motion to compel arbitration. Plaintiff filed a cross-appeal, challenging the Court of Appeals' findings on plaintiff's motion for partial summary disposition. For the reasons stated below, we reverse the Court of Appeals' judgment with respect to the motion to compel arbitration and vacate the remaining portions of the Court of Appeals' decision relating to plaintiff's motion for partial summary disposition.[5]

---

[5] In light of our resolution of defendant's application for leave to appeal, plaintiff's application for leave to appeal as cross-appellant is denied as moot.

Additionally, after oral argument in this Court, plaintiff filed a "Motion to Correct the Record and to Impose Sanctions for Misconduct at Mini Oral Argument." Plaintiff alleged that, on the record during oral argument, defendants misrepresented the Firm's indemnification obligations and also violated court procedures by allowing a supposedly unauthorized person to sit at defense counsel's table. Defendants responded in opposition. Plaintiff's motion is denied for lack of any legal or factual basis to support its claims.

8

## II. STANDARD OF REVIEW

This Court reviews de novo a circuit court's decision on a motion for summary disposition brought under MCR 2.116(C)(7). *Fane v Detroit Library Comm*, 465 Mich 68, 74; 631 NW2d 678 (2001). Under MCR 2.116(C)(7), summary disposition is appropriate if a claim is barred because of "an agreement to arbitrate[.]" Whether a particular issue is subject to arbitration is also reviewed de novo, *In re Nestorovski Estate*, 283 Mich App 177, 184; 769 NW2d 720 (2009), as is the interpretation of contractual language, *Morley v Auto Club of Mich*, 458 Mich 459, 465; 581 NW2d 237 (1998).

## III. ANALYSIS

"Arbitration is a matter of contract." *Kaleva-Norman-Dickson Sch Dist No 6 v Kaleva-Norman-Dickson Sch Teachers' Ass'n*, 393 Mich 583, 587; 227 NW2d 500 (1975). Accordingly, when interpreting an arbitration agreement, we apply the same legal principles that govern contract interpretation. See *F J Siller & Co v City of Hart*, 400 Mich 578, 581; 255 NW2d 347 (1977). Our primary task is to ascertain the intent of the parties at the time they entered into the agreement, which we determine by examining the language of the agreement according to its plain and ordinary meaning. See *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 174; 848 NW2d 95 (2014). In considering the scope of an arbitration agreement, we note that "[a] party cannot be required to arbitrate an issue which [it] has not agreed to submit to arbitration." *Kaleva*, 393 Mich at 587. "The general policy of this State is favorable to arbitration." *Detroit v A W Kutsche*, 309 Mich 700, 703; 16 NW2d 128 (1944). The burden is on the party seeking to avoid the agreement, not the party seeking to enforce the agreement. *McKinstry v*

9

*Valley Obstetrics-Gynecology Clinic, PC*, 428 Mich 167, 184; 405 NW2d 88 (1987). In deciding the threshold question of whether a dispute is arbitrable, a reviewing court must avoid analyzing the substantive merits of the dispute. *Kaleva*, 393 Mich at 594-595. If the dispute is arbitrable, "the merits of the dispute are for the arbitrator." *Id*. at 595.

Applying these principles, we must consider whether the language of the arbitration clause in the Operating Agreement is intended to cover the instant dispute between plaintiff and the individually named defendants. The critical portion of the agreement reads:

> Any dispute, controversy or claim . . . between the Firm . . . and any current or former Principal . . . of any kind or nature whatsoever (including . . . compensation, or the payment or non-payment of any bonus . . .) shall be solely and conclusively resolved according to the following procedure [arbitration].

To resolve this issue, we must analyze two aspects of this provision. First, we must determine *who* the parties intended to include in the phrase, "between the Firm . . . and . . . [a] former Principal." Second, we must determine whether *the subject matter* of the instant dispute is covered by the arbitration clause.

With respect to who is included, it is undisputed that plaintiff is a former principal. Therefore, this question turns on whether "the Firm" was meant to include the individually named defendants. Here, we must consider the concept of agency. Although no Michigan court has explicitly applied agency principles when interpreting an arbitration clause, it is well established that "corporations can only act through officers and agents." *Attorney General v Nat'l Cash Register Co*, 182 Mich 99, 111; 148 NW 420 (1914). See *Junius Ten Eyck v Pontiac, Oxford & Port Austin Railroad Co*, 74 Mich

10

226, 232; 41 NW 905 (1889) ("The directors of a corporation are its agents."); *Mossman*

*v Millenbach Motor Sale*s, 284 Mich 562, 569; 280 NW 50 (1938) ("Where a corporation

has intrusted a manager with the general supervision of a particular branch of its

business, it invests him with the power of a general agent . . . .").[6]  This reflects the fact

that a company is not a physical being capable of taking its own actions or making its

own decisions.  Indeed, a firm cannot act on its own behalf.  *Fraser Trebilcock Davis &*

*Dunlap PC v Boyce Trust 2350*, 497 Mich 265, 275; 870 NW2d 494 (2015).  Therefore,

"the acts of officers and agents of a corporation, within the scope of their employment,

are the acts of the corporation[.]"  *Nat'l Cash Register*, 182 Mich at 111.[7]

---

[6] We recognize that some cited caselaw addresses situations where agents acted on behalf of "a corporation," whereas, in the instant case, the Firm is a professional limited liability company.  However, in applying agency principles to interpret the instant arbitration clause, we see no reason to distinguish between a corporation and another type of company, and therefore extend these established principles to the instant matter.

[7] In its opinion in the instant case, the Court of Appeals extensively reviewed two previous Michigan cases and ultimately found them inapplicable: *Hall v Stark Reagan, PC*, 294 Mich App 88; 818 NW2d 367 (2011), rev'd in part 493 Mich 903 (2012), and *Rooyakker & Sitz v Plante & Moran, PLLC*, 276 Mich App 146; 742 NW2d 409 (2007). *Altobelli*, 307 Mich App at 625-631.  In *Hall*, this Court considered an arbitration clause that covered " 'a dispute regarding interpretation or enforcement of . . . the parties' rights or obligations' " under a shareholders' agreement.  *Hall*, 493 Mich at 903.  This Court held that a dispute involving the motives of the defendants for invoking the separation provisions of the shareholders' agreement fell within the scope of that particular arbitration clause.  *Id*.  In *Rooyakker*, the Court of Appeals concluded that two tort claims against nonparties to an arbitration agreement fell within the scope of an arbitration clause that included "any dispute or controversy arising out of or relating to" the agreement.  *Rooyakker*, 276 Mich App at 163.  Not only was the language of the arbitration clauses in those cases substantially different from the arbitration clause in the instant case, neither case considered whether claims against particular individuals, acting as agents, fell within the scope of an arbitration clause, which is at issue in the instant case.  We thus agree with the Court of Appeals that neither case is instructive in the instant matter.

Not only is this particular concept of agency ingrained in our caselaw, the statutory scheme governing the Operating Agreement also incorporates this principle. Under the Operating Agreement, the Firm is a limited liability company formed under the MLLCA. MCL 450.4401(a) states that if the management of a limited liability company is delegated to its members, "[t]he members are considered managers for purposes of applying this act, including section 406 regarding *the agency authority* of managers . . . ." (Emphasis added.) MCL 450.4406, in turn, states: "A manager is *an agent* of the limited liability company for the purpose of its business . . . ." (Emphasis added.) MCL 450.4402(4) adds: "If the articles of organization delegate management of a limited liability company to managers, the articles of organization constitute notice to third parties that managers, not members, have *the agency authority* described in section 406." (Emphasis added.) The MLLCA explicitly refers to agency authority and the ability of individuals to act as agents for limited liability companies, which further supports the application of agency principles to interpret the instant arbitration clause.

When interpreting an arbitration clause, other jurisdictions have similarly applied agency principles. In *Pritzker v Merrill Lynch, Pierce, Fenner & Smith, Inc*, 7 F3d 1110, 1122 (CA 3, 1993) (citation omitted; alteration in original), the United States Court of Appeals for the Third Circuit noted that a corporation " 'can only act through its employees, and an arbitration agreement would be of little value if it did not extend to [them].' " In *Arnold v Arnold Corp-Printed Communications for Business*, 920 F2d 1269, 1281 (CA 6, 1990), the Sixth Circuit Court of Appeals reasoned that if a plaintiff could " 'avoid the practical consequences of an agreement to arbitrate by naming . . .

12

signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified.' " (Citation omitted.) The First Circuit agreed:

> Such a rule is necessary, our sister circuits have reasoned, because a corporate entity or other business can only operate through its employees and an arbitration agreement would be a meaningless arrangement if its terms did not extend to them. . . . Any other rule, in the view of these courts, would permit the party bringing the complaint to avoid the practical consequences of having signed an agreement to arbitrate; naming the other party's officers, directors or employees as defendants along with the corporation would absolve the party of all obligations to arbitrate. [*Grand Wireless, Inc v Verizon Wireless, Inc*, 748 F3d 1, 11 (CA 1, 2014), citing *Arnold*, 920 F2d at 1281.]

For the above reasons, we hold that agency principles apply in determining who is included within the scope of the arbitration clause.

Next, we must consider whether the arbitration clause encompasses the subject matter of the dispute at issue in this case. Generally speaking, to ascertain whether the subject matter of a dispute is of the type that parties intended to submit to arbitration, we again begin with the plain language of the arbitration clause. See *Miller-Davis*, 495 Mich at 174. We then consider whether a plaintiff's particular action falls within that scope. We note that the gravamen of an action is determined by considering the entire claim. See *Maiden v Rozwood*, 461 Mich 109, 135; 597 NW2d 817 (1999). We look beyond the mere procedural labels to determine the exact nature of the claim. *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 711; 742 NW2d 399 (2007). This is to avoid "artful pleading." *Maiden*, 461 Mich at 135.

## IV. APPLICATION

Turning to the instant case, we first consider who is included within the scope of the arbitration clause in the Operating Agreement, and we next consider whether the

13

subject matter of the instant dispute is covered by the clause.  With respect to who is included, we begin with the plain language of the clause, asking whether the parties to the Operating Agreement intended to include these particular defendants within the meaning of "the Firm."  See *Miller-Davis*, 495 Mich at 174.  Here, we note that the Operating Agreement clearly recognizes the agency principles previously discussed.  The Operating Agreement, signed "by and between" plaintiff and defendants as an "agreement between them," delegates authority to certain individuals to carry out the Firm's business and manage its internal affairs.  Managing directors are invested with the "[s]ole, full and complete power and authority to manage . . . the Firm . . . ."  The CEO has, "with binding effect on the Managing Directors, the power and authority of the Managing Directors with respect to the day-to-day administration of the business and affairs of the Firm."  Thus, the language of the Operating Agreement evidences the parties' understanding that a company cannot act on its own, but instead depends on the actions of agents to carry out its business.  See *Nat'l Cash Register*, 182 Mich at 111.[8]  By signing the Operating

---

[8] We also note that the arbitration clause does not limit its scope to a dispute "*naming* the Firm" and a former principal, but rather "*between* the Firm" and a former principal.  Had the parties intended that those named in the caption of a lawsuit dictate the scope of the agreement, they could have chosen particular language to indicate as much.  The fact that they did not do so adds additional support to the conclusion that the plain language of the agreement evinces the intent to more broadly include agents within the meaning of "the Firm."  Plaintiff cannot now avoid the practical consequences of the arbitration clause simply by naming defendants in their individual capacities only.  See *Arnold*, 920 F2d at 1281; *Grand Wireless*, 748 F3d at 11.

14

Agreement and accepting the arbitration clause, plaintiff was aware that certain individuals would be operating on the Firm's behalf.[9]

Under the facts of this case, defendants are those individuals operating on the Firm's behalf. Defendants are the five managing directors, the CEO, and the head of the Firm's litigation group. The Operating Agreement explicitly endows them with complete power and responsibility for managing the affairs of the Firm.[10] As officers, managers, and directors entrusted with carrying out the Firm's business, defendants are agents of the

---

[9] The Court of Appeals generally noted the following principle: " 'It is well established that corporate employees and officials are personally liable for all tortious and criminal acts in which they participate, regardless of whether they are acting on their own behalf or on behalf of a corporation.' " *Altobelli*, 307 Mich App at 630-631, quoting *Joy Mgt Co v Detroit*, 183 Mich App 334, 340; 455 NW2d 55 (1990). But resolution of the issues presented in this appeal does not require the invocation of this principle. In this appeal, we must decide *in what venue* plaintiff must bring his dispute, not whether the individual defendants may be held personally liable for the tortious actions alleged within that dispute. We conclude that, because plaintiff's claims challenge defendants' actions taken in their capacity as agents of the Firm, plaintiff's dispute falls within the scope of this particular arbitration clause and must therefore be resolved in arbitration. Since this dispute must be resolved in arbitration, whether these defendants can be held personally liable for the challenged actions is a substantive matter reserved for the arbitrator. See *Kaleva*, 393 Mich at 595.

[10] We acknowledge that defendant Coakley is not a managing director or CEO, but rather is a principal who is the head of the Firm's litigation group. However, plaintiff does not argue that Coakley's unique status disqualifies him from being considered an agent. Regardless, this argument would be meritless, because principals too can be agents of a company. See *Mossman*, 284 Mich at 568; MCL 450.4401; MCL 450.4404(2)(a) ("In discharging the manager's duties, a manager may rely on information, opinions, reports, or statements . . . if prepared or presented by [a manager or principal] whom the manager reasonably believes to be reliable and competent in the matter presented."). The Operating Agreement itself states that "[t]he Principals do hereby agree to . . . engage in the practice of law under the name 'Miller, Canfield, Paddock and Stone, P.L.C.,' " and "[e]ach Principal shall devote his or her full time and best efforts to the success of the Firm . . . ."

15

Firm. *Junius Ten Eyck*, 74 Mich at 232; *Mossman*, 284 Mich at 569; MCL 450.4406. Their acts are acts of the company. *Nat'l Cash Register*, 182 Mich at 111. Because it is axiomatic that the Firm cannot act on its own, *Fraser Trebilcock*, 497 Mich at 275, and because these particular defendants are clearly endowed with agency authority to administer the Firm's affairs, the individually named defendants must be included within the meaning of "the Firm" in the arbitration clause.[11]

Next, we turn to whether the arbitration clause covers the subject matter of the dispute at issue in this case. The arbitration clause covers "[*a*]*ny dispute*, controversy or

---

[11] The Court of Appeals noted that the arbitrator selection process in the arbitration clause requires the selection of three arbitrators, "one of whom shall be appointed by the Firm, one by the Principal(s) . . . and the third of whom shall be appointed by the first two arbitrators." *Altobelli*, 307 Mich App at 628 (quotation marks omitted). The Court of Appeals reasoned that, in a dispute between principals, the Firm would not be a party, yet the selection process would nonetheless require the Firm to select an arbitrator. *Id.* The Court of Appeals concluded that this evinced the parties' intent to distinguish between the Firm and its principals as well as an intent to exclude disputes between principals from the scope of the arbitration clause. *Id.*

Certainly, this language distinguishes between the Firm and *an adversarial principal* in the arbitration proceeding, giving each the power to select an arbitrator. This provision does not, however, demonstrate any intent to exclude individual principals from the meaning of "the Firm." The selection procedure still functions even if the proceeding involves individually named defendants and a plaintiff; the defendants could collectively choose one arbitrator and the plaintiff could choose another. In fact, were we to agree with the Court of Appeals that individuals could not be included within the meaning of "the Firm," this selection process would not work. The Firm, a company, cannot actually appoint its own arbitrators. The Firm itself cannot take any action at all. Instead, the act of appointing an arbitrator must be done by the Firm's representatives in the arbitration proceeding. In ascertaining the intent of the parties at the time they entered the contract, See *Miller-Davis Co*, 495 Mich at 174, we must conclude that this undeniable reality was understood by the parties. This further demonstrates the intent to include individual principals within the meaning of "the Firm," without explicitly stating as much in the arbitration clause.

16

claim . . . between the Firm . . . and [a] former Principal . . . *of any kind or nature whatsoever* (including . . . compensation, or the payment or non-payment of any bonus . . .)." (Emphasis added.) At the outset, we emphasize the extremely broad and inclusive language of this provision. The plain language of the arbitration clause indicates that "any dispute" must be between the Firm and a former principal. Therefore, we consider more specifically whether the subject matter of the dispute reflects actions taken by the individual defendants as agents of the Firm.

In considering the gravamen of plaintiff's complaint, we examine the entire claim, looking beyond procedural labels to determine the exact nature of the claim. *Maiden*, 461 Mich at 135; *Adams*, 276 Mich App at 710-711. The result of this inquiry indicates that the instant dispute falls within the wide expanse of "any dispute" between the Firm and a current or former principal. To begin, in the factual recitation section of his complaint, plaintiff states that he initially approached defendants Hartmann and Coakley to propose a leave of absence that might have put him at odds with the section of the Operating Agreement obligating a principal to devote his or her full time to the Firm. In doing so, plaintiff acknowledged that his request was subject to the rules established in the Operating Agreement, and also that he believed Hartmann and Coakley had the authority to sanction his proposal. Similarly, when Hartmann appeared unreceptive, plaintiff informed the managing directors that he did not intend to relinquish his equity status or compensation, again informing the Firm's decision-makers that he sought protection under the Operating Agreement. Plaintiff subsequently demanded the requisite two-thirds vote of the principals before his membership could be terminated, as outlined in the Operating Agreement. Believing that the managers ultimately terminated

17

his ownership without this necessary vote, plaintiff now requests economic damages, particularly the "fair allocation of income (salary and bonuses)." Thus, the essence of plaintiff's allegations is that defendants' actions deprived plaintiff of the compensation and bonuses to which he was entitled. The arbitration clause explicitly encompasses a dispute involving "*compensation*, or the payment or non-payment of *any bonus*[.]" (Emphasis added.) This alone places plaintiff's dispute squarely under the mantle of the arbitration clause.

Examining plaintiff's individual claims further entrenches this dispute within the scope of the arbitration clause. Plaintiff first alleges breach of fiduciary duty. Plaintiff substantiates this claim with numerous factual allegations which inextricably tie defendants' actions as agents of the Firm to the deprivation of plaintiff's rights under the Operating Agreement. "Bad-faith" allegations against defendants include "refusing to disclose information relevant to the affairs of the Firm," "excluding [plaintiff] from involvement in significant Firm committees," "isolating [plaintiff] from discussions about a client," and "terminat[ing plaintiff's] ownership position without a vote of the Firm's owners." All of these alleged actions reflect decisions made by defendants in their capacities as the Firm's agents, employing powers provided to them under the Operating Agreement and agency principles. See *Mossman*, 284 Mich at 569 ("Where a corporation has intrusted a manager with the general supervision of a particular branch of its business, it invests him with the power of a general agent . . . .") (quotation marks and citation omitted); see also MCL 450.4401; MCL 450.4402(4). Therefore, this particular claim involves a dispute between the Firm and plaintiff, and is thus covered by the arbitration clause.

18

Likewise, to substantiate his claims of illegal shareholder oppression under MCL 450.4515, tortious interference with a business relationship or expectancy, and civil conspiracy, plaintiff asserts that defendants improperly terminated plaintiff's ownership in contravention of procedures established by the Operating Agreement. Plaintiff's conversion claim maintains that defendants "deprived [plaintiff] of his property without due process required by law—the process required by the Operating Agreement." Plaintiff's claim alleging bad-faith misrepresentation avers that defendants intentionally duped plaintiff in order to secure the Firm's business for themselves and other principals. Thus, in each individual claim, plaintiff takes issue with defendants' actions as agents making decisions for the Firm, which plaintiff believes interfered with his financial entitlements under the Operating Agreement.

In sum, plaintiff's dispute falls within the scope of the mandatory arbitration clause in the Operating Agreement. A company can only act through its agents, the individual defendants are agents of the Firm, and plaintiff's claims inextricably tie defendants' actions as agents to the alleged deprivation of plaintiff's rights under the Operating Agreement. Plaintiff's dispute is subject to binding arbitration.

## V. CONCLUSION

We reverse the part of the Court of Appeals' opinion regarding the motion to compel arbitration and instead hold that this case is subject to binding arbitration under the arbitration clause of the Operating Agreement. Accordingly, the lower courts should not have reached the merits of plaintiff's motion for partial summary disposition, as the motion addresses substantive contractual matters that must be resolved by the arbitrator.

19

Therefore, we vacate the portion of the Court of Appeals' opinion related to plaintiff's motion for partial summary disposition and remand this case to the trial court for further proceedings consistent with this opinion.

Richard H. Bernstein
Robert P. Young, Jr.
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Joan L. Larsen