# STATE OF MICHIGAN

# COURT OF APPEALS

AFSCME LOCAL 1128,

　　　　　Plaintiff-Appellee,

v

CITY OF TAYLOR,

　　　　　Defendant-Appellant.

UNPUBLISHED
January 19, 2017

No.　328669
Wayne Circuit Court
LC No.　15-001250-CL

Before: TALBOT, C.J., and JANSEN and HOEKSTRA, JJ.

PER CURIAM.

In this labor relations dispute, defendant City of Taylor ("the city") appeals as of right a circuit court order granting plaintiff AFSCME Local 1128's ("the union's") motion to compel arbitration of two grievances. Because the trial court properly granted the union's motion to compel arbitration, we affirm.

In 2006, the parties entered into a collective bargaining agreement (CBA), which was to be effective until June 30, 2010. Article 19 of the CBA set forth a process for resolving grievances and disputes between the parties "concerning the application, meaning or interpretation" of the CBA. Specifically, in article 19.4, the parties agreed to arbitration as follows:

> The arbitration proceedings will be conducted in accordance with the rules of the American Arbitration Association. The power of the arbitrator stems from this Agreement and his function is to interpret and apply this Agreement and to pass upon alleged violations thereof. The arbitrator has no power to add to, subtract from, or modify any terms of this Agreement. The decision of the arbitrator shall be final and binding upon the City, the Union and the grievant.

Pertinent to the present case, the CBA also sets forth several staffing related provisions, including articles 5.2 and 24.2, which in relevant part, state as follows:

> 5.2　　The City agrees that it shall employ no less than one hundred (100) regular full-time Local 1128 employees. The City further agrees that this provision shall be effective from the date of ratification by the parties and shall remain in full force and effect during the duration of this Agreement and continue in full force

-1-

and effect until such time as a subsequent Labor Agreement is negotiated and ratified by both parties. . . .

24.2    The City agrees to maintain the following levels in the following clerical classifications:

>  9 – Clerk 3's
> 17 – Clerk 2's

Related to these staffing provisions, as noted, the CBA was set to expire on June 30, 2011. However, under article 45.2, the CBA "shall be extended automatically." Notwithstanding this automatic extension, under the CBA's terms, with the exception of article 5.2 and article 21.1,[1] either party may elect to terminate the CBA "by giving a ten (10) workday written notice to the other party." In comparison, as set forth in article 45.2, articles 5.2 and 21.1 were not subject to cancellation, but remained in full force and effect until a new CBA was ratified by the parties.

On June 3, 2011, the union filed what the parties refer to as "grievance 2011-1." In that grievance, plaintiff indicated that the city violated Articles 5 and 45 of the CBA by not employing at least 100 members of the bargaining unit. On June 13, 2011, the union submitted another grievance, "grievance 2011-6," based on the city's failure to employ the number of clerks required by Article 24.2. On July 13, 2011, the union brought an unfair labor practice (ULP) charge against the city before the Michigan Employment Relations Commission (MERC), claiming that the city repudiated the CBA by laying off 29 employees in violation of articles 5 and 24. Then, on September 14, 2011, the union filed "grievance 2011-20," claiming that the city violated numerous CBA provisions, including but not limited to Articles 5.2 and 24.2, by "[f]ailure to pay union scale wage for duties historically performed by Clerks 2s."

Pending the MERC proceedings, arbitration of the parties' various grievances were held in abeyance. On July 11, 2013, hearing referee Doyle O'Connor ("ALJ") heard arguments and orally ruled on the parties' competing motions for summary disposition on the ULP charge. The ALJ specified that it was considering "whether there was a bargaining violation, not whether there was a contract violation." While not resolving all the issues presented in the ULP charge, the ALJ determined that partial summary disposition would be appropriate, in part, because the city could not, as a matter of public policy, permanently bind itself to staffing numbers. More fully, the ALJ determined that:

> a perpetual numerical staffing agreement, at least as to non-safety sensitive employees, impermissibly intrudes on a core managerial function, and upon a non-delegable duty of public employers to determine the appropriate level of services and necessary staffing within existing budgetary constraints, at least to the extent of a decision to cease or curtail providing a service as opposed to subcontracting of that service.

---

[1] Article 21.1 provided in part that "[n]o bargaining unit employee hired on or before June 30, 2000 may be laid off."

In addition, the ALJ opined that the city "arguably" provided notice of its intent to terminate the staffing provisions when it laid off 29 people, thereby decreasing the staffing levels well below the contractual minimum. The ALJ did not issue a written decision or recommendation.

Following the ALJ's oral ruling on the record, the parties proceeded to arbitrate grievance 2011-20. The arbitrator concluded that the grievance, which implicated articles 5.2, 24.2, and 45.2, was not timely under the terms of the CBA. Despite finding that the grievance was untimely, the arbitrator stated that "if the merits of such claims were to be decided, the decision would be that the ostensibly perpetual 100-employee guarantee was terminable at will and [the city] effectively did terminate it in June 2011" by laying off employees.[2] In reaching this conclusion, the arbitrator relied heavily on the ALJ's examination of the CBA, concluding that the ALJ "carefully, persuasively and correctly analyz[ed] and answer[ed] the underlying question of the fundamental nature" of the parties' agreement with respect to the city's obligation to maintain staffing levels in perpetuity. Ultimately, to the extent the union's 2011-20 grievance implicated articles 5.2, 24.2, and 45.2, the grievance was denied.

Following arbitration of grievance 2011-20, the union requested arbitration hearing dates relating to grievances 2011-1 and 2011-6. The city refused to submit to arbitration, informing the union that res judicata and collateral estoppel precluded a "rematch" on the issues that were fully litigated before, and decided by, the ALJ and the arbitrator of grievance 2011-20.

In early 2015, the union initiated the current lawsuit in circuit court and moved to compel arbitration. The city opposed the request for arbitration, arguing that the ALJ's decision as well as the 2011-20 arbitration precluded arbitration of grievances 2011-1 and 2011-6. The circuit court determined that the issue in grievance 2011-6 clearly had not been decided by the ALJ and that, more generally, the preclusion issues involved a "close question" which should be decided by the arbitrator. For these reasons, the circuit court granted the union's motion to compel arbitration and dismissed the union's complaint without prejudice. The city now appeals as of right.

On appeal, the city argues that the claims raised in grievances 2011-1 and 2011-6 are not subject to arbitration because these issues are barred by the doctrines of res judicata and collateral estoppel as a result of the previous decisions of the ALJ and the arbitrator of grievance 2011-20. Applying the reasoning set forth by the ALJ, the city maintains that the CBA's staffing provisions are legally unenforceable and thus not subject to arbitration. Moreover, citing the ALJ's decision, the city likewise contends that the city's actions provided notice that it was terminating the CBA and, according to the city, it does not have to arbitrate staffing provisions that have been terminated. The city argues that these various issues were gateway questions of arbitrability for the circuit court to decide and that the circuit court erred by granting the union's motion for summary disposition without addressing the preclusive effect of the previous decisions of the ALJ and the arbitrator of grievance 2011-20. We disagree.

---

[2] Given that grievance 2011-20 was found to be untimely, the parties debate whether the arbitrator's substantive findings amount to mere dicta.

"Whether a dispute is arbitrable represents a question of law for the courts that we review de novo." *Madison Dist Pub Sch v Myers*, 247 Mich App 583, 594; 637 NW2d 526 (2001). "The existence of a contract to arbitrate and its enforceability constitute judicial questions that we also consider de novo." *In re Nestorovski Estate*, 283 Mich App 177, 197; 769 NW2d 720 (2009). This Court also reviews de novo whether a specific issue should be decided by a court or an arbitrator. *American Federation of State v Hamtramck Housing Comm*, 290 Mich App 672, 674; 804 NW2d 120 (2010).

"The duty to arbitrate grievances arises from [the] contractual agreement between an employer and its employees." *Id.* (citation omitted). In a lawsuit to compel arbitration, a court's inquiry is limited to the gateway question of arbitrabiltiy. *Ottawa Co v Jaklinski*, 423 Mich 1, 25; 377 NW2d 668 (1985); *Bienenstock & Assoc, Inc v Lowry*, 314 Mich App 508, 516; 887 NW2d 237 (2016).

> A three-part test applies for ascertaining the arbitrability of a particular issue: 1) is there an arbitration agreement in a contract between the parties; 2) is the disputed issue on its face or arguably within the contract's arbitration clause; and 3) is the dispute expressly exempted from arbitration by the terms of the contract. [*In re Nestorovski Estate*, 283 Mich App at 202 (citation and quotation marks omitted).]

In deciding this gateway question, "[a]rbitration agreements are generally interpreted in the same manner as ordinary contracts. They must be enforced according to their terms to effectuate the intentions of the parties." *Oakland-Macomb Interceptor Drain Drainage Dist v Ric-Man Const, Inc*, 304 Mich App 46, 55–56; 850 NW2d 498 (2014) (citation omitted). Any conflicts should be resolved in favor of arbitration, and a court "should not allow the parties to divide their disputes between the court and an arbitrator." *Fromm v Meemic Ins Co*, 264 Mich App 302, 306; 690 NW2d 528 (2004). Further, "a court should not interpret a contract's language beyond determining whether arbitration applies." *Id.*

Aside from gateway questions implicating substantive arbitrability, a case may involve "procedural questions which grow out of the dispute and bear on its final disposition." *Bienenstock*, 314 Mich App at 516. Unless otherwise specified in the parties' contract, procedural questions are to be decided by the arbitrator and not the courts. *Id.* In other words, "where substantive issues of a dispute are proper subjects for arbitration, procedural matters arising out of the dispute are for the arbitrator and not the courts to determine." *Bennett v Shearson Lehman-Am Exp, Inc*, 168 Mich App 80, 83; 423 NW2d 911 (1987). "Examples of procedural questions for the arbitrator to decide include whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration, and allegation[s] of waiver, delay, or a like defense to arbitrability." *Bienenstock*, 314 Mich App at 516 (citation and quotation marks omitted). See also *American Federation of State*, 290 Mich App at 676 (concluding that determinations regarding timeliness and the defense of laches must be made by the arbitrator). "When the issue presented is close and there is doubt about whether an issue is a gateway question for the court or a procedural one for the arbitrator, we should resolve that doubt in favor of arbitration." *Bienenstock*, 314 Mich App at 516 (citation and quotation marks omitted).

In this case, substantively, the grievances set forth in 2011-1 and 2011-6 are plainly within the CBA's arbitration clause. Article 19 allows for arbitration of grievances "concerning the application, meaning or interpretation" of the CBA, which clearly includes grievances relating to the application and interpretation of articles 5.2, 24.2, and 45.2 as alleged in grievances 2011-1 and 2011-6. Indeed, the city does not dispute that, as a general proposition, the grievances in question are arbitrable.

Instead, the city maintains that previous decisions by the ALJ and arbitrator of grievance 2011-20 preclude further arbitration under the doctrines of res judicata and/or collateral estoppel. Contrary to the city's argument, the application of res judicata and collateral estoppel present questions for the arbitrator. While we are unaware of a Michigan decision to decide this precise issue, numerous courts have determined that the application of res judicata and collateral estoppel present questions for the arbitrator rather than the court.[3] See, e.g., *Employers Ins Co of Wausau v OneBeacon Am Ins Co*, 744 F3d 25, 27 (CA 1 2014); *Klay v United Healthgroup, Inc*, 376 F3d 1092, 1109 (CA 11 2004); *Intl Union v Dana Corp*, 278 F3d 548, 555 (CA 6 2002); *Chiron Corp v Ortho Diagnostic Sys, Inc*, 207 F3d 1126, 1132 (CA 9 2000); *Indep Lift Truck Builders Union v NACCO Materials Handling Group, Inc*, 202 F3d 965, 968 (CA 7 2000). We find these decisions persuasive.[4]

That is, application of the doctrines of res judicata and collateral estoppel does not address the substantive arbitrability questions of whether there is an agreement to arbitrate, whether the issue falls within the arbitration clause, and whether the dispute is expressly exempted from arbitration by the terms of the contract. See *In re Nestorovski Estate*, 283 Mich App at 202. Instead, these preclusive doctrines involve matters of procedural arbitrability which "grow out of the dispute and bear on its final disposition." See *Bienenstock*, 314 Mich App at 516. In other words, like laches and matters of timeliness, res judicata and collateral estoppel function as potential defenses to arbitration, and it is generally for arbitrators to decide the application of defenses to arbitration. See *Amtower v William C Roney & Co*, 232 Mich App 226, 233; 590 NW2d 580 (1998). Indeed, there is a presumption in favor of arbitration, which requires us to resolve any doubt on a close question in favor of arbitration. *Bienenstock*, 314 Mich App at 516; *American Federation of State*, 290 Mich App at 676. To do otherwise would result in piecemeal litigation, contrary to the central purpose of arbitration. *American Federation of State*, 290 Mich App at 676. Consequently, unless otherwise specified in the parties' contract, whether arbitration is precluded under the doctrines of res judicata and collateral estoppel poses a

---

[3] In comparison to the ample legal authority provided by the union, we note that the city has failed to provide us with any authority to support the proposition that, in the context of arbitration, the application of res judicata and collateral estoppel involve questions of substantive arbitrability for the courts. Given the city's failure to cite any legal authority for its position, the issue could be deemed abandoned. See *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 695; 880 NW2d 269 (2015).

[4] While not binding, caselaw from federal courts may be considered as persuasive authority. *Travelers Prop Cas Co of Am v Peaker Servs, Inc*, 306 Mich App 178, 188; 855 NW2d 523 (2014).

question for the arbitrator to decide in the first instance. See generally *Bienenstock*, 314 Mich App at 516. Because the CBA in this case contains no indication that res judicata and collateral estoppel should be addressed by a court, rather than the arbitrator, the trial court properly submitted the matter to arbitration.[5]

Aside from arguments that further arbitration is precluded by previous decisions, the city contends that the CBA is unenforceable, that the agreement has been terminated as a result of the layoffs, and that, in these circumstances, there existed no binding agreement to arbitrate the union's grievances. We disagree. Certainly, it is a judicial function to ascertain the existence of an agreement to arbitrate and the enforceability of the arbitration agreement. See *In re Nestorovski Estate*, 283 Mich App at 197. However, in this case, the city's arguments regarding unenforceability relate to the unenforceability of the staffing provisions and *not* the enforceability of the agreement to arbitrate. That the staffing provisions might be unenforceable does not render the entirety of the CBA and, in particular, the arbitration clause unenforceable.[6] Instead, the parties clearly entered into a contract containing a valid arbitration provision that governs the grievances set forth in 2011-1 and 2011-6. The underlying merits of that dispute— namely, the application and interpretation of articles 5.2, 24.2, and 45.2—pose a question for the arbitrator. See *Altobelli v Hartmann*, 499 Mich 284, 296; 884 NW2d 537 (2016). To rule on the enforceability of these provisions would require contract interpretation beyond deciding the gateway arbitrability question; and we will not engage in contract interpretation in the guise of deciding the arbitrability question. See *Ottawa Co*, 423 Mich at 25; *Fromm*, 264 Mich App at 306.

Likewise, we disagree with the city's contention that it was not required to arbitrate because the city terminated the CBA.[7] Under the plain terms of the agreement, the CBA was to

---

[5] In determining that the preclusion issues should be decided by the arbitrator in the first instance, we offer no opinion on the merits of the city's preclusive arguments. That is, the city is free to assert during arbitration that res judicata and collateral estoppel bar arbitration of grievances 2011-1 and 2011-6. See *Indep Lift Truck Builders Union, Inc*, 202 F3d at 968. Moreover, should the arbitrator reach the merits of the case, submitting the matter to arbitration will not prevent the city from asserting, after arbitration, that there was an impermissible conflict between the MERC decision and the arbitration decision. See *Bay City Sch Dist v Bay City Ed Ass'n, Inc*, 425 Mich 426, 442; 390 NW2d 159 (1986); see also *Dearborn Hts Sch Dist No 7 v Wayne Co MEA/NEA*, 233 Mich App 120, 123; 592 NW2d 408 (1998).

[6] To the contrary, even if the staffing provisions are unenforceable, the CBA contains a severability clause entitled "conformity to law," which provides that "[a]ll other provisions of [the CBA] shall continue in effect" in the event that a provision of the CBA is found unenforceable.

[7] "Whether a contract has been terminated—and therefore no longer exists, eliminating the contractual duty to arbitrate—is a question for the court, not the arbitrator." *36th Dist Court v AFSCME Local 917*, 295 Mich App 502, 515; 815 NW2d 494 (2012), rev'd in part on other grounds, 493 Mich 879 (2012).

expire in June of 2010.  However, with the exception of articles 5.2 and article 21.1, by its express terms, the CBA continued in effect until one of the parties gave a ten workday written notice to the other party.  It is undisputed that the city did not give such notice until May 2013.

Despite this fact, the city argues that the CBA terminated in 2011 upon layoff of numerous employees.  The city's contention that the CBA was terminated by the layoff of employees is premised on the ALJ's decision, wherein the ALJ indicated that the city "arguably" gave notice of its intent to terminate article 5.2 by decreasing staffing levels below 100.  As discussed, the preclusive effect of this decision poses a question for the arbitrator.  In any event, the city's argument ignores the obvious distinction between articles 5.2 and 21.1 (which were not subject to cancellation until a new agreement was reached) and the remainder of the CBA, including the arbitration provision (which could be terminated with 10 workdays written notice).  While provisions of an indefinite duration are generally terminable at-will, the arbitration clause in this case is subject to specific mechanisms for termination which were not followed by the city until May of 2013, long after the grievances arose and were filed.  See *Lichnovsky v Ziebart Intern Corp*, 414 Mich 228, 236; 324 NW2d 732 (1982).  See also *Pinckney Cmty Sch Bus Drivers Ass'n v Pinckney Cmty Sch Bd of Ed*, 216 Mich App 363, 365; 548 NW2d 713 (1996).  Thus, even assuming that article 5.2 and other staffing provisions effectively terminated with the layoff of employees in 2011,[8] the arbitration clause and the rest of the CBA remained valid and enforceable at the time the union's rights vested.  See generally *Ottawa Co*, 423 Mich at 23-26; *American Federation of State*, 290 Mich App at 676-677.  In short, the city has not demonstrated that the CBA terminated and the agreement to arbitrate was not eliminated.  Instead, the agreement to arbitrate remained valid and enforceable until May of 2013, and the merits of the parties' dispute were for the arbitrator to decide.

Affirmed.  Having prevailed in full, plaintiff may tax costs pursuant to MCR 7.219.

/s/ Michael J. Talbot
/s/ Kathleen Jansen
/s/ Joel P. Hoekstra

---

[8] We offer no opinion as to whether article 5.2 and other staffing provisions were terminable at-will or whether the layoff of employees served to terminate the staffing provisions in the CBA.  See generally *Pinckney*, 216 Mich App at 365-366.  While the city attempts to frame the termination of article 5.2 as bearing on the gateway arbitrability question, in our judgment, the propriety of the layoffs, including whether such layoffs could constitute notice of intent to terminate staffing provisions, speaks to the heart of the merits of the parties' dispute.  In other words, these issues are simply outside the gateway arbitrability question presented to this Court and are instead questions of contract interpretation for the arbitrator.  See *Fromm*, 264 Mich App at 306.  We will not become entangled in the construction of the substantive provisions of the CBA in the guise of deciding arbitrability.  *Ottawa Co*, 423 Mich at 25.