*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RED FIT, LLC and CALI RED, LLC,

      Plaintiffs-Appellants,

v

RED EFFECT INTERNATIONAL FRANCHISE,
LLC, RED EFFECT HOLDINGS, LLC, RED
EFFECT LA COUNTY, LLC, RED EFFECT
ORANGE COUNTY, LLC, ALLIE MALLAD,
CARLOS GUZMAN, ERICA MALLAD, ROBERT
VENDITTELLI, and CHELSIE BENDER,

      Defendants-Appellees.

UNPUBLISHED
May 30, 2024

No. 363686
Oakland Circuit Court
LC No. 2021-186383-CB

Before: FEENEY, P.J., and M. J. KELLY and RICK, JJ.

PER CURIAM.

Plaintiffs, Red Fit, LLC, and Cali Red, LLC, appeal as of right, challenging the trial court's
final order of involuntary dismissal and many of the court's earlier orders. We affirm in part,
reverse in part, and remand for further proceedings.

## I. BACKGROUND

The underlying facts generally are not in dispute. Brothers Hayden Epstein and Joshua
Epstein are the members of plaintiffs Red Fit, LLC and Cali Red, LLC. On September 26, 2017,
Hayden and Joshua entered into agreements with defendant Red Effect International Franchise,
LLC.[1] These agreements allowed the Epstein brothers to own and operate three separate franchise
locations in the San Diego area (the San Diego Franchise Agreements). That same day, the

---

[1] The agreement was actually with Zifit International Franchise, LLC, but Zifit later changed its
name to Red Effect International Franchise, LLC. For ease of reference and consistency, we will
refer to any agreements made with Zifit as having been made with Red Effect International.

Epsteins executed with Red Effect International an Area Development Agreement (ADA) for the San Diego County territory.[2]  The San Diego Franchise Agreements and the San Diego ADA all contain the same arbitration provision, which provided:

### 17.1    Binding Arbitration

Except for actions described in Section 17.6, all controversies, disputes or claims between: (i) Franchisor and/or its Affiliates and their respective owners, officers, directors, members, managers, employees, agents or representatives; and (ii) Franchisee, and/or its Affiliates and their respective owners, officers, directors, members, managers, employees, agents or representative; arising out of or related to (1) this Agreement or any other agreement between Franchisor and Franchisee or any provision of such agreement; (2) Franchisor's relationship with Franchisee; or (3) the scope and validity of this Agreement or any other agreement between Franchisee and Franchisor or any provisions or such agreements (including the validity and scope of the arbitration obligations under this Article, which the parties acknowledge is to be determined by an arbitrator and not a court); must be submitted for binding arbitration in accordance with the provisions of this Article 17 on the demand of either party. . . .

Also on September 26, 2017, Hayden entered into three other franchise agreements to own and operate three franchise locations in Illinois (the Illinois Franchise Agreements).  Hayden also executed a contemporaneous ADA associated with the Illinois locations.

The Epstein brothers wanted to acquire area development and franchise rights to Orange County, California.  At their request, Red Effect agreed to swap the Illinois ADA and Illinois Franchise Agreements with area development and franchise rights to Orange County.  As a result, on July 10, 2018, Hayden signed a Franchise Termination Agreement terminating the Illinois Franchise Agreements.  On that same date, Red Fit and Red Effect International entered into ADAs for Orange County and Los Angeles County and three franchise agreements for franchises to be operated in each county.  On May 30, 2019, Red Fit assigned its rights in the San Diego ADA to plaintiff Cali Red.

Red Fit sold its rights to the Orange County ADA and its rights to the Los Angeles County ADA to defendant Red Effect Orange County and defendant Red Effect LA County, respectively, in repurchase agreements dated November 5, 2019.  On November 12, 2019, Red Effect International and Red Fit executed Franchise Termination and Mutual Release Agreements (the 2019 TRAs) for the Los Angeles County and Orange County ADAs.  The TRAs contained a release provision, in which both sides released the other side "from all liability, right, claim, debt and cause of action whatsoever, known or unknown, suspected or unsuspected . . . arising under or related to the [ADA] or any other agreement entered into between the parties on or before the date of this Agreement."

---

[2] Hayden and Joshua later assigned their rights in the San Diego Franchise Agreements and the San Diego ADA to their company, Red Fit, LLC.

Red Effect International and Red Fit then entered into three franchise agreements for Orange County (the 2019 Orange County Franchise Agreements) and three franchise agreements for Los Angeles County (the 2019 LA County Franchise Agreements). These agreements do not contain arbitration provisions and instead state:

Franchisee and Franchisor have negotiated regarding a forum in which to resolve any disputes which may arise between them and have agreed to select a forum in order to promote stability in their relationship. Therefore, unless expressly provided for otherwise in this Agreement, if a claim is asserted in any legal proceeding involving Franchisee (or its owners, officers, directors, or Affiliates) and Franchisor (or its officers, directors, members, Affiliates, or sales employees) both parties agree that the exclusive jurisdiction for disputes between them shall be the U.S. Federal Courts for the Eastern District of Michigan or the State Courts for Oakland County, Michigan and each waive any objection either may have to the personal jurisdiction of or venue in the State of Michigan.

A dispute arose regarding franchise royalties owed on the San Diego Franchise Agreements. Red Effect International filed a demand for arbitration against plaintiffs, and Red Fit objected, arguing that the matter was not subject to arbitration. Red Fit maintained that the 19 subsequent agreements it executed with Red Effect International provide that "any" claims are to be resolved in Michigan court. The arbitrator ruled that the arbitration clauses in the San Diego Franchise Agreements controlled because "each of the several agreements here is a discrete agreement, and disputes arising under each agreement are to be resolved within the four corners of the particular agreement involved, including their respective dispute resolution clauses."

On February 12, 2021, plaintiffs filed the instant complaint in the Oakland Circuit Court, alleging the following counts: Count I (breach of contract based on Red Effect International's arbitration demand), Count II (breach of contract based on the 2019 Repurchase Agreements), Count III (violation of Michigan's Franchise Investment Law (MFIL), MCL 445.1501 *et seq.*, regarding the November 2019 Agreements), Count IV (violation of California's Franchise Investment Law (CFIL), Cal Corp Code 31000 *et seq.*, regarding the November 2019 Agreements), Count V (reformation of the Orange County and LA County Agreements), Count VI (violation of the CFIL regarding the San Diego Agreements), Count VII (violation of the MFIL regarding the San Diego Agreements), Count VIII (violation of the CFIL regarding the San Diego Agreements), Count IX (violation of the MFIL as to the San Diego Agreements), Count X (violation of the CFIL as to the San Diego Agreements), Count XI (violation of the MFIL as to the Orange County and LA County Agreements), Count XII (discharge of the San Diego ADA and San Diego Franchise Agreement by frustration of purpose), Count XIII (discharge of the San Diego ADA and San Diego Franchise Agreements by impracticability), Count XIV (declaratory judgment—modification and waiver of two of the San Diego Franchise Agreements), Count XV (breach of contract and covenant of good faith and fair dealing regarding the San Diego ADA), Count XVI (unjust enrichment), Count XVII (breach of contract and covenant of good faith and fair dealing regarding the San Diego Franchise Agreements), and Count XVIII (breach of contract regarding the San Diego ADA commissions.

In lieu of filing an answer, defendants moved for partial summary disposition under MCR 2.116(C)(7) and argued that all of the counts except for Count II were subject to mandatory

arbitration or barred by release. Defendant alternatively argued that Counts III and IV failed to state a claim for relief, warranting summary disposition under MCR 2.116(C)(8) on those counts. In response, plaintiffs argued, among other things, that defendants ignored the 19 subsequent agreements between Red Fit and Red Effect International that supersede the arbitration agreements and that provide for resolution in the Oakland Circuit Court.

On June 11, 2021, the trial court entered an amended scheduling order that provided, in pertinent part, that lists of witnesses and proposed exhibits were to be submitted to opposing counsel and the court by December 15, 2021 and disclosure of expert witnesses were due by November 30, 2021.

On August 26, 2021, the trial court granted in part and denied in part defendants' motion. The court ruled that because Counts I, VI-X, and XII-XVIII all related to the San Diego Agreements, which were subject to binding arbitration, those claims should be dismissed in favor of arbitration. The court rejected plaintiffs' argument that the subsequent agreements superseded the San Diego Agreements. The court noted that because the agreements were "separate and distinct," the earlier agreements were not superseded. The trial court also ruled that Counts V and XI were barred because of release. To the extent that Counts III and IV, which sought rescission, related to the 2019 ADA Repurchase Agreements and TRAs, those claims were barred by release. But to the extent that Counts III and IV pertained to the 2019 Franchise Agreements, they were not barred by release. The trial court denied defendants' motion with respect to MCR 2.116(C)(8).[3] Consequently, only Count II and certain aspects of Counts III and IV remained.

Defendants filed their expert-witness list on November 30, 2021, and their lay-witness and proposed-exhibit list on December 15, 2021. Both filings stated that they were being made pursuant to the court's "Amended Scheduling Order Dated June 11, 2021." Plaintiffs, as of those dates, had not filed any witness or exhibit lists.

On January 31, 2022, defendants filed another motion for summary disposition. This motion sought summary disposition under MCR 2.16(C)(8) and (10). Defendants argued that under MCR 2.116(C)(8), the remaining Counts II, III, and IV against the individual defendants should be dismissed because they are not individually liable and are not individual parties to the contracts at issue. Defendants further argued that those counts should be dismissed in their entirety under MCR 2.116(C)(10) because, with plaintiffs having failed to file witness lists, they were unable to substantiate their claims.

On February 2, 2022, plaintiffs filed a motion to extend dates, stay proceedings, and stay arbitration pending appeal.[4] In the motion, plaintiffs' counsel acknowledged that he "dropped the

---

[3] Plaintiff filed with this Court an application for leave to appeal the trial court's decision, which this Court denied "for failure to persuade the Court of the need for immediate appellate review." *Red Fit LLC v Red Effect Int'l Franchise LLC*, unpublished order of the Court of Appeals, entered February 10, 2022 (Docket No. 358561).

[4] Defendant Red Effect International had filed a new arbitration case, alleging additional violations of the San Diego Franchise Agreements.

ball" by failing to recognize that the court had entered the June 11, 2021 scheduling order and failing to file any witness list. Plaintiffs argued that judicial economy favored a stay and that defendants would not be prejudiced if one were granted. Regarding this latter argument, plaintiffs averred that "[d]efendants are not without fault" and have "unclean hands" because they failed to file an answer.

The trial court denied plaintiffs' motion. The court found that there was no good cause asserted, that there were no unforeseen or exceptional circumstances present, and that the motion did not comply with MCR 2.503(B)(2) or (3) because the motion failed to specify how many adjournments have already been granted or how many adjournment requests have been made. The court noted that "[s]elf-inflicted wounds do not void the Court's scheduling order." The court also sanctioned plaintiffs because the section in their brief starting with "Defendants are not without fault" was "completely devoid of factual and legal merit." Plaintiffs were to pay defendants their reasonable attorney fees and costs for having to respond to that argument.[5]

The day after the trial court entered its order denying plaintiffs' motion to extend dates, plaintiffs filed with the trial court their witness and exhibit lists. Plaintiffs also filed with the court clerk notices of default against defendants. Defendants immediately filed a motion to strike and for involuntary dismissal pursuant to MCR 2.504(B). Defendants sought to strike the notices of default and the witness and expert lists. Defendants also argued that plaintiffs' complaint should be involuntarily dismissed because of plaintiffs' failure to abide by two court orders: the June 11, 2021 scheduling order and the court's recent order denying plaintiffs' motion to extend dates.

The trial court issued an opinion and order granting in part and denying in part defendants' motion. The court noted that because the underlying notices of default were never accepted for filing, the issue regarding them was moot. The trial court granted defendants' motion to strike plaintiffs' witness lists and ruled that meeting the deadline was entirely within plaintiffs' control and that negligence or carelessness does not constitute good cause. The court, however, denied defendants' request for involuntary dismissal under MCR 2.504(B), reasoning that any issues with regard to the defaults were moot and the striking of the untimely witness lists was an appropriate and proportional lesser remedy.

The remaining claims had proceeded to case evaluation. The case evaluation panel unanimously determined that plaintiffs' action (the remaining portions of Counts II, III, and IV) was frivolous. Defendants accepted the award, while plaintiffs rejected it. Plaintiffs never sought review of the frivolous determination. See MCR 2.403(N)(2) (allowing a party to have a court review a case evaluation panel's frivolous finding). Plaintiffs also never posted any bond. See MCR 2.403(N)(3) ("[I]f a party's claim or defense was found to be frivolous under subrule (K)(4), that party shall post a cash or surety bond . . . ."). Defendants subsequently moved for the dismissal of plaintiffs' remaining claims with prejudice. Defendants argued that plaintiffs' failure to post the required bond required dismissal under MCR 2.403(N)(3)(c).[6] Plaintiffs asserted that

---

[5] The parties later stipulated to an amount of reasonable attorney fees and costs.

[6] MCR 2.403(N)(3)(c) provides:

the court rule pertaining to frivolous claims only applies to tort claims and that while Counts II, III, and IV were submitted to case evaluation, none of the claims was a tort claim.

The trial court granted in part and denied in part defendants' motion to dismiss. The court noted that "[t]he lynchpin of the Motion is whether any of the Plaintiff's [sic] various Counts actually constitute torts." The court ruled that Count II "obviously" is a breach-of-contract claim and that because piercing the corporate veil is a theory of recovery and not a separate cause of action, the motion was denied "with regard to those claims and the Defendants named therein." However, the trial court granted the motion with respect to Counts III and IV. The court ruled that the claims against the individual defendants sounded in tort. The court also noted that the Michigan Supreme Court has previously held that any civil wrong that is not based on contract sounds in tort. The court therefore granted the motion "as to individual Defendants Allie Mallad ("Mallad"), Carlos Guzman, Erica Mallad, Robert Vendittelli, and Chelsie Bender."

On August 30, 2022, the trial court denied defendants' January 31, 2022 motion for summary disposition. The court acknowledged that because of the intervening partial grant of defendants' motion to dismiss, there was only a single count, Count II, that was up for consideration. The court denied defendants' motion because it concluded that defendants did not adequately argue or cite any authority that there was no genuine issue of material fact for trial.

Trial on the remaining Count II commenced on October 11, 2022. In his opening statement, counsel for plaintiffs reiterated his point from his trial brief that because defendants never filed an answer to the complaint, the allegations in the complaint are deemed admitted. In defense counsel's opening statement, he moved for involuntary dismissal under MCR 2.504(B)(2), maintaining that because plaintiffs were precluded from presenting any witnesses or exhibits, they could not meet their burden to prove a prima facie case of breach of contract. With regard to failing to file an answer, defense counsel averred that it was irrelevant because he received an "indefinite extension" from plaintiffs in December 2021. Moreover, defense counsel argued that, assuming the failure to file an answer had a consequence, that consequence would be liability, but damages would still need to be proven, which plaintiffs could not do without any witnesses. The trial court recognized that both sides argued that trial was not warranted for differing reasons. The court took the matter under advisement and stated it would issue a written opinion.

The trial court issued an opinion and order on October 14, 2022. The court framed the issues as follows:

> In their Opening Statements, the parties, who disagree on just about everything, agreed on one thing—the case should not go to trial. This tortuous journey presents a couple of civil procedure questions that would be excellent for a final exam in law school. What happens when a party never files an answer, but no default is ever entered? Or what occurs when a party's witness list is struck, can they still

---

If the bond is not posted as required by this rule, the court shall dismiss a claim found to have been frivolous . . . . The action shall proceed to trial as to the remaining claims and parties . . . .

-6-

present witnesses at trial? This Opinion and Order unravels these and a few more mysteries.

Regarding the first issue, the trial court ruled that defendants' failure to file an answer resulted in them admitting liability in connection with Count II. This was the case despite no default having ever been entered. But the court ruled that this admission did not extend to "the amount of damage or the nature of the relief demanded."

Related to the second issue, the trial court held that plaintiffs' failure to follow the scheduling order did not constitute good cause to reopen discovery and adjourn trial. The court also ruled that plaintiffs' request to allow them to present witnesses is an untimely motion for reconsideration of the court's February 25, 2022 order and should be denied for that independent reason. The court further ruled that, assuming the request was timely, plaintiffs abandoned the argument by failing to address the pertinent factors from *Dean v Tucker*, 182 Mich App 27, 32-33; 451 NW2d 571 (1990), and instead "cursorily declar[ing] that the Defendants knew who the witnesses were and that to bar the Plaintiffs' witnesses is too harsh a remedy equivalent to dismissing the case." Moreover, the trial court determined that assuming the issue was not abandoned, after analyzing many facts, it would exercise its discretion to not allow plaintiffs to present witnesses. Consequently, with plaintiffs unable to prove any damages, the trial court dismissed the sole remaining Count II.

This appeal followed.

## II. FIRST MOTION FOR SUMMARY DISPOSITION

Plaintiffs challenge the trial court's grant of summary disposition under MCR 2.116(C)(7) on the basis of an agreement to arbitrate and release. We find no error.

This Court reviews a trial court's decision to grant or deny a motion for summary disposition de novo. *PNC Nat'l Bank Ass'n v Dep't of Treasury*, 285 Mich App 504, 505; 778 NW2d 282 (2009). Likewise, the proper interpretation of a contract and whether a particular issue is subject to arbitration are issues that this Court reviews de novo. *Altobelli v Hartmann*, 499 Mich 284, 295; 884 NW2d 537 (2016).

"Under MCR 2.116(C)(7), summary disposition is appropriate if a claim is barred because of 'an agreement to arbitrate.' *Id*. Summary disposition also is warranted under that subrule if a claim is barred "because of release." MCR 2.116(C)(7). "A movant under MCR 2.116(C)(7) is not required to file supportive material, and the opposing party need not reply with supportive material. Moreover, the contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *Fisher Sand & Gravel Co v Neal A Sweebe, Inc*, 494 Mich 543, 553; 837 NW2d 244 (2013).

The trial court granted summary disposition in favor of defendants on plaintiffs' Counts I, VI-X, and XII-XVIII because those claims involved disputes related to the San Diego Agreements, which contained arbitration clauses. There is no dispute that these counts pertained to the San Diego Agreements and that those agreements contained arbitration clauses. Despite this clear

language, plaintiffs maintain that the arbitration clauses were superseded by the parties' later agreements, which contain the following language:

> Franchisee and Franchisor have negotiated regarding a forum in which to resolve any disputes which may arise between them and have agreed to select a forum in order to promote stability in their relationship. Therefore, unless expressly provided for otherwise in this Agreement, if a claim is asserted in any legal proceeding involving Franchisee (or its owners, officers, directors, or Affiliates) and Franchisor (or its officers, directors, members, Affiliates, or sales employees) both parties agree that the exclusive jurisdiction for disputes between them shall be the U.S. Federal Courts for the Eastern District of Michigan or the State Courts for Oakland County, Michigan and each waive any objection either may have to the personal jurisdiction of or venue in the State of Michigan.

Plaintiffs contend that the fact that the parties unambiguously agreed to resolve "any" dispute in the above manner indicates that this agreement superseded the prior agreement to arbitrate.

The Court's primary task in construing contracts is to give effect to the intent of the parties at the time they entered into the contract. *Beck v Park West Galleries, Inc*, 499 Mich 40, 45-46; 878 NW2d 804 (2016). In *Beck*, the plaintiffs purchased art from the defendant on multiple occasions over the course of several years. *Id*. at 42. However, at one point, the parties' agreements started to contain an arbitration clause; which provided that "[a]ny disputes or claims of any kind" were to be resolved through arbitration. *Id*. at 43. Thus, while the earlier invoices did not contain such an agreement, the later ones did. The Supreme Court unanimously ruled that despite the broad language of the later arbitration agreement, it nonetheless did not apply to any disputes related to the earlier contracts. *Id*. at 50-51. The Court noted that under Michigan law, "separate contracts [are] to be treated separately." *Id*. at 46. The Court ruled that there was no basis to conclude that the parties had intended for the later arbitration clauses to apply retroactively. *Id*. at 47. The Court relied on the fact that despite the broad language in the arbitration clause, there was no reference to the previous transactions to suggest that the clause was to apply to those transactions. *Id*. at 48.

The same rationale applies to this case. The earlier San Diego Agreements solely involve franchise locations in the San Diego area. The other agreements addressed franchise locations in other locations, including Orange County, California; Los Angeles County, California; and Illinois. Because each contract is considered a "separate contract" and because there is no indication that the parties contemplated that the forum clauses in the later contracts would apply to disputes arising from the earlier San Diego contracts, the trial court did not err by concluding that the arbitration provisions in the San Diego Agreements were not superseded. We therefore affirm the grant of summary disposition under MCR 2.116(C)(7) to defendants on plaintiffs' Counts I, VI-X, and XII-XVIII.

We next address the trial court's grant of summary disposition with respect to the entirety of Counts V and XI and partial aspects of Counts III and IV on account of release. Defendants' motion was premised on the releases in the November 12, 2019 TRAs, which provided:

Area Developer and the affiliates, representatives, owners, employees, officers, guarantors, agents and assigns of Area Developer (the "Area Developer Parties") hereby release and forever discharge Franchisor and its affiliates and the representatives, owners, employees, officers, agents and assigns of Franchisor and its affiliates (the "Franchisor Parties") from all liability, right, claim, debt and cause of action whatsoever, known or unknown, suspected or unsuspected, which the Area Developer Parties ever had, now have or may have at any time based on, arising under or relating to the Area Development Agreement or any other agreement entered into between the parties on or before the date of this Agreement or the relationship between the parties involving the Area Development Agreement or any other agreement or any acts or omissions of the Franchisor Parties occurring before the date of this Agreement: provided that, this release will not affect; (a) any obligations of Franchisor Parties under this Agreement; and (b) any obligations of the Franchisor Parties required to be performed after the date of this Agreement under any other agreements between the parties.

In opposing defendants' motion, plaintiffs did not contest that the scope of the above release reached the claims at issue. Instead, plaintiffs contended that the TRAs containing the releases were subject to rescission under Counts III and IV of the complaint, which would then vitiate the release provisions. Count III alleged a violation of the MFIL and Count IV alleged a violation of the CFIL. Both counts were premised on the allegation that each respective franchise law was violated because defendants failed to provide a finance disclosure document before the execution of the 2019 agreements, as required by those acts. Thus, the parties agree that the resolution of this issue depends on the validity of Counts III and IV.

Count III alleges a violation of MCL 445.1508(1) of the MFIL, which provides:

A franchise shall not be sold in this state without first providing to the prospective franchisee, at least 10 business days before the execution by the prospective franchisee of any binding franchise or other agreement or at least 10 business days before the receipt of any consideration, whichever occurs first, a copy of the disclosure statement described in [MCL 445.1508(2)], the notice described in [MCL 445.1508(3)], and a copy of all proposed agreements relating to the sale of the franchise.

And "[a] person who offers or sells a franchise in violation of [MCL 445.1505 or MCL 445.1508] is liable to the person purchasing the franchise for damages or rescission." MCL 445.1531(1).

The California law is similar and provides:

It is unlawful to sell any franchise in this state that is subject to registration under this law without first providing to the prospective franchisee, at least 14 days prior to the execution by the prospective franchisee of any binding franchise or other agreement, or at least 14 days prior to the receipt of any consideration, whichever occurs first, a copy of the franchise disclosure document, together with a copy of all proposed agreements relating to the sale of the franchise. [Cal Corp Code 31119(a).]

-9-

And "[a]ny person who offers or sells a franchise in violation of [list of sections, including Section 31119] . . . shall be liable to the franchisee or subfranchisor, who may sue for damages caused thereby, and if the violation is willful, the franchisee may also sue for rescission." Cal Corp Code 31300.

While plaintiffs focus on the "or other agreement" language in MCL 445.1508(1) and Cal Corp Code 31119(a), the relevant provisions are MCL 445.1531(1) and Cal Corp Code 31300 because those are the provisions that authorize the pertinent rescission remedies. And under those provisions, rescission is only available when a "person who offers or sells a franchise" is in violation of the disclosure requirement. MCL 445.1531(1); Cal Corp Code 31300.

The trial court correctly ruled that the 2019 TRAs did not involve the offer or sale of a "franchise." A "franchise" under the MCL 445.1502(3) of the MFIL is defined as follows:

[A] contract or agreement, either express or implied, whether oral or written, between 2 or more persons to which all of the following apply:

(a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor.

(b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate.

(c) the franchisee is required to pay, directly or indirectly, a franchise fee.

As the trial court recognized, this definition is substantially the same as California's definition. See Cal Corp Code 31005(a).

In the TRAs in this case, the parties agreed to terminate the Orange County and Los Angeles County ADAs, dated July 10, 2018. There is nothing in the TRAs granting a franchisee the right to engage in the business of offering, selling, or distributing goods or services. Instead, the TRAs simply terminate the prior ADAs. Because the TRAs do not involve the offer or sale of a "franchise," the TRAs are not subject to rescission under the MFIL and CFIL, and their release provisions are valid and enforceable. Consequently, any of plaintiffs' causes of action asserting claims that pre-dated November 12, 2019, are barred by release and were properly dismissed under MCR 2.116(C)(7).

Because Counts V and XI pertain to such agreements, the trial court properly dismissed those claims in their entirety. With regard to Counts III and IV, plaintiff sought rescission of the ADA Repurchase Agreement, the ADA TRAs, and the November 22, 2019 Franchise Agreements. Because only the November 22, 2019 Franchise Agreements did not pre-date the November 12, 2019 release, the court correctly denied the motion for summary disposition with respect to that

aspect of plaintiffs' claims, but properly granted the motion with respect to the other aspects that pre-dated the November 12, 2019 release.[7]

Plaintiffs on appeal argue that the TRAs are "consideration" for the November 22, 2019 Franchise Agreements and therefore should be subject to rescission. We disagree. The TRAs state that they constitute the entire agreement with respect to the matters covered in them. The stated purpose of the TRAs is found in ¶ 1, which provides:

> Franchisor and Area Develop are parties to an Area Development Agreement dated July 10, 2018, as amended, for Orange County, California (the "Area Development Agreement"). Area Developer has entered into an agreement to sell its rights under the Area Development Agreement to a purchaser acceptable to Franchisor (the "Purchaser"). Franchisor has waived its right of first refusal and approved the transfer in accordance with Section 13.3 of the Area Development Agreement. In accordance with Section 13.3 of the Area Development Agreement, the Franchisor and Area Developer are terminating the Area Development Agreement so that Franchisor may enter into a new area development agreement with the Purchaser.

Section 13.3 of the ADAs that were being terminated provide, in pertinent part:

> If Franchisor does not exercise its right of first refusal under Section 13.2, Area Developer may only engage in the proposed Transfer if Franchisor consents to the proposed Transfer. Before Franchisor consents to a proposed Transfer, the conditions listed below, as well as any other reasonable conditions specified by Franchisor, must be fulfilled. If these conditions are met, Franchisor will not unreasonable withhold its consent to a proposed Transfer of the type permitted by this Agreement.

> Before Franchisor consents to a proposed Transfer, the following conditions must be fulfilled:

> \* \* \*

> (f) Area Developer must sign at the time of sale an agreement terminating this Agreement (unless this Agreement will be assigned to the transferee . . .) and must sign an agreement, in the form specified by Franchisor, releasing Franchisor and its Affiliates, owners, officers, directors, employees and agents from any and all claims and causes of action and agreeing to abide by the post-termination restrictions contained in Articles 11 and 12 and all other obligations under this Agreement that survive termination of this Agreement.

---

[7] The trial court declined to address whether Counts VI-X were also subject to release because of its earlier ruling that those claims were barred given they were subject to arbitration. We likewise will not address those claims in the context of release.

Therefore, it is clear that under § 13.3(f) of the ADAs, the signing of the TRAs was a contractually required step for plaintiffs to sell their rights under the ADAs to another party. While this step may have been a *condition* for them to go forward with a subsequent franchise purchase agreement, it is not *consideration* for that completely separate contract. Notably, plaintiffs do not point to any language in any contract to support their position. Moreover, our review of the November 22, 2019 Franchise Agreements reveals that there is no express mention that executing the TRAs is consideration. Instead, the consideration for the Franchise Agreements appears to be that, in exchange for granting franchise rights in a protected area, the franchisee would be obligated to pay many fees, including a percentage of its gross sales going forward. Critically, there is no mention that part of the consideration the franchisee owed would be to have entered into a TRA for any prior ADA. Therefore, plaintiffs' position, that the TRAs are consideration and subject to rescission just as the November 22, 2019 Franchise Agreements are, is not supported by the plain language of the pertinent contracts.

### III. ISSUES RELATED TO WITNESSES AND WITNESS LISTS

Plaintiffs argue that the trial court erred when it denied their motion to extend the deadline for filing witness lists, struck their late-filed witness lists, and prohibited them from calling witnesses. We disagree on all points.

We review a trial court's decision on a motion to extend deadlines for an abuse of discretion. See *Decker v Trux R Us, Inc*, 307 Mich App 472, 478; 861 NW2d 59 (2014) (stating that court's decision on a motion to extend discovery is reviewed for an abuse of discretion); *Grubor Enterprises, Inc v Kortidis*, 201 Mich App 625, 628; 506 NW2d 614 (1993) (stating that "[w]itness lists are an element of discovery"). We also review a trial court's decision to strike a witness list and a decision to bar witness testimony after a party has failed to timely submit a witness list for an abuse of discretion. See *EDI Holdings, LLC v Lear Corp*, 469 Mich 1021 (2004); *Duray Dev, LLC v Perrin*, 288 Mich App 143, 162; 792 NW2d 749 (2010); *Linsell v Applied Handling, Inc*, 266 Mich App 1, 21; 697 NW2d 913 (2005). A court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

The trial court's decisions to deny plaintiffs' motion to extend the deadline for filing witness lists and to strike plaintiffs' late-filed witness lists do not fall outside the range of reasonable or principled outcomes. A trial court has the inherent authority to control its own docket and internal affairs. *Baynesan v Wayne State Univ*, 316 Mich App 643, 651; 894 NW2d 102 (2016); see also *Maldonado*, 476 Mich at 376 (stating that courts have the vested power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases"). As our Supreme Court has noted, "The court rules provide for and encourage the use of scheduling orders to promote the efficient processing of civil and criminal cases." *People v Groves*, 455 Mich 439, 465; 566 NW2d 547 (1997). Indeed, decisions made for the enhancement of "docket control" and the elimination of "unjustifiable expense and delay" are proper considerations of a trial court. *Id*.; see also *EDI Holdings*, 469 Mich at 1021 (stating that a court does not abuse its discretion when it enforces a summary-disposition scheduling order, even if doing so results in the movant prevailing because the opposing party failed to timely file a response).

-12-

We do not see how the trial court's decisions were unprincipled. The court's scheduling order clearly provides deadlines for filing the witness lists. Plaintiffs' counsel admittedly missed it and did not provide any good explanation except for suggesting that he had transitioned to a new legal assistant who failed to obtain the scheduling order from the electronic filing system. Plaintiffs then went on to suggest that defendants bore some blame because, had they filed an answer, "[p]laintiffs would have promptly discovered their error." While defendants did fail to file an answer, that does not provide a strong rationale for plaintiffs' failure to recognize the existence of the June 11 scheduling order. Indeed, plaintiffs argued that they were under the erroneous impression that the court was withholding entering a scheduling order until plaintiffs' application for leave to appeal in this Court was resolved. It is unclear to us how the filing of an answer by defendants would have alerted plaintiffs to the existence of the June 11 order if they truly thought the trial court was waiting to issue its order until after this Court resolved the appeal. Furthermore, when defendants timely filed their expert-witness list on November 30, 2021, and their lay-witness list on December 15, 2021, both lists referenced that they were being filed pursuant to the trial court's "Amended Scheduling Order Dated June 11, 2021." Plaintiffs offered no explanation for why they were not aware as of November 30, 2021, that there was a June 11, 2021 scheduling order.[8] Although this notice may have been too late for plaintiffs to comply with the November 30 deadline for expert witnesses, they could have at least complied with the lay-witness list deadline. Instead, they did nothing and waited until defendants moved for summary disposition on the remaining claims. Under these circumstances, the trial court's decisions to deny plaintiffs' motion to extend the deadline dates and to strike the late-filed witness lists did not fall outside the range of reasonable or principled outcomes.[9]

Plaintiffs next argue that the trial court erred when it disallowed them from calling any witnesses because there was no timely filed witness list. "MCR 2.401(I)(1) provides that all parties must file and serve witness lists within the time allotted by the trial court. MCR 2.401(I)(2) provides that '[t]he trial court may order that any witness not listed in accordance with this rule will be prohibited from testifying at trial except upon good cause shown.' " *Duray Dev*, 288 Mich App at 162-163. As this Court explained in *Duray Dev*:

> Once a party has failed to file a witness list in accordance with the scheduling order, it is within the trial court's discretion to impose sanctions against that party. These sanctions may preclude the party from calling witnesses. Disallowing a party to call witnesses can be a severe punishment, equivalent to a dismissal. But that proposition does not mean that disallowing witnesses is always tantamount to a dismissal. Nor does it mean that a trial court cannot impose such a sanction even if it is the equivalent of dismissal. Because the decision is within the trial court's discretion, caselaw mandates that the trial court consider the circumstances of each case to determine if such a drastic sanction is appropriate. The record should reflect that the trial court gave careful consideration to the factors

---

[8] Indeed, in the trial court, plaintiffs acknowledged that these lists "should have alerted [counsel] to the overlooked Amended Scheduling Order dated June 11, 2021."

[9] Because the court's decision is authorized though its inherent powers, whether the trial court erroneously relied on MCR 2.503(B) or local administrative order 2004-6(D) is of no consequence.

-13-

involved and considered all of its options in determining what sanction was just and proper in the context of the case before it. [*Id*. at 164-165 (quotation marks, citations, and brackets omitted).]

In *Dean*, 182 Mich App at 32-33, this Court provided the following nonexhaustive list of factors a court should consider as relevant:

(1) whether the violation was willful or accidental; (2) the party's history of refusing to comply with discovery requests (or refusal to disclose witnesses); (3) the prejudice to the defendant; (4) actual notice to the defendant of the witness and the length of time prior to trial that the defendant received such actual notice; (5) whether there exists a history of plaintiff's engaging in deliberate delay; (6) the degree of compliance by the plaintiff with other provisions of the court's order; (7) an attempt by the plaintiff to timely cure the defect and (8) whether a lesser sanction would better serve the interests of justice. [Citations omitted.]

The trial court addressed these eight factors, plus five other ones it deemed relevant. On appeal, plaintiffs do not directly address the trial court's analysis of all of these factors. They only address the first and third factors and then cursorily claim that "[e]ach of the remaining factors, save for the 'sanctionable conduct' factor, discussed below, would have weighed in [plaintiffs'] favor." Arguably, by failing to fully address the trial court's analysis, the issue could be deemed abandoned. See *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). Regardless, we will proceed with the pertinent analysis.

For Factor (1), the court found that the failure to timely file a witness list was "reckless" with plaintiffs' "indifference" being "obvious and palpable." Aside from the issuance of the order itself, the court noted that it discussed the deadline dates at the case management conference. The court further recognized that plaintiffs had two separate notices—when defendants filed their expert-witness list on November 30, 2021, and when defendants filed their lay-witness list on December 15, 2021—that plaintiffs conceded should have alerted them to the fact that there was a scheduling order. As the court found, "[t]here is no reasonable explanation of why all of these opportunities were completely missed by the Plaintiffs."

For the next factor, the court noted that it was unaware of any refusal to comply with discovery requests.

For Factor (3), the trial court found that with no witness lists and only corporate defendants remaining, there is "extreme prejudice" for them.[10] The court rejected plaintiffs' position that defendants knew who was involved in the case and what their testimony would be. The trial court noted that not knowing which witnesses plaintiffs intended to call until after discovery was closed results in "tremendous" prejudice to defendants. Further, the court recognized that without

---

[10] As discussed later, individual defendant Mallad should not have been dismissed under MCR 2.403(N)(3)(c) and should have been a defendant at trial as well. Regardless, the concept that a defendant would have been prejudiced by the lack of a witness list applies to corporate and individual defendants alike.

-14-

knowing who plaintiffs intended to call, defendants' trial strategy could be "completely flummoxed."

For Factor (4), the trial court recognized that plaintiffs provided some notice of the witnesses they intended to call when they filed their late witness list and that some of those witnesses were on defendants' own witness list. But the notice was supplied after the close of discovery. This seems to align with the analysis from Factor (3) above.

For Factor (5), which relates to whether plaintiffs had a history of engaging in "deliberate delay," the court found that although plaintiffs may not have engaged in deliberate delay, their failure to timely file witness lists constituted "reckless indifference."

Factor (6) addresses plaintiffs' degree of compliance with other provisions of the court's order. The court noted that it was unaware of any additional noncompliance.

Factor (7) addresses whether plaintiffs attempted to timely cure the defect. The court found that this factor was addressed in Factor (4), where it noted that plaintiffs had not attempted to timely cure the defect because the attempt occurred after the close of discovery.

For Factor (8), addressing whether a lesser sanction would better serve the interests of justice, the court noted that the only lesser sanction available would be to allow the untimely witness list filing, reopen discovery, set a new deadline for motions for summary disposition, and resubmitting the case to facilitation. The trial court found that this would "eviscerate the authority of [the court] to control its docket." Plaintiffs cite the trial court's ruling but do not explain why the court was incorrect at the time it made its ruling. Plaintiffs aver that at the time of the final order, more than half of the one-year-and-nine-months' delay is attributable to the trial court's orders. We find this fact to be irrelevant. As discussed later, plaintiffs' primary argument seems to be that the court should have considered these *Dean* factors at the time it struck plaintiffs' late-filed witness list.

In addition to the eight *Dean* factors, the trial court addressed several other factors it deemed relevant, stating as follows:

> **(9) the age of the case.** As noted, this case is 1 year and 9 months old. To allow a lesser sanction would push this well beyond the normal limits of a case.

> **(10) sanctionable conduct.** When the Plaintiffs first sought an adjournment, they engaged in sanctionable conduct by speciously attempting to push the blame on the Defendants for the self-inflicted wounds. They continue to case blame on others, now including the Court Clerk and the Court (they are not being sanctioned for such deflections).

> **(11) the number of witnesses.** This is not a case in which the Plaintiffs are asking to present one or two witnesses missed on a witness list. The Plaintiffs demand that they present 7 witnesses, presumably over a series of days. This substantially increased the prejudice to the Defendants.

**(12) the type of witnesses.** The individual Defendants have been dismissed. As such, the necessity of identifying who would testify in connection with entity claims was even more vital.

**(13) prior rulings on the merits.** Although clearly the Plaintiffs would have otherwise been entitled to a trial on Count II and perhaps prevailed (all things being even), 17 of the 18 counts have been dismissed, as have all the individual Defendants. The entire case was found to be frivolous and the tort claims were dismissed because of the failure to post a bond.

The court concluded, "Considering the totality of the factors (even excluding factor 13), as well as the jurisprudence cited above, prohibiting the Plaintiffs from calling witnesses is warranted."

Plaintiffs challenge the trial court's findings related to Factors (1) and (3). Plaintiffs contend that their "prompt action in response to discovering that the deadline for filing witness lists had passed" demonstrates that there was no reckless indifference. Plaintiffs focus on what they did *after* learning that there was a witness-list deadline, however. Their argument does not address why it took them so long to finally realize that there was a scheduling order with deadlines. It is this aspect that the court categorized as a reckless indifference. The trial court did not clearly err. Plaintiffs also contend that defendants would not have been prejudiced because they knew, from plaintiffs' late-filed witness lists, who plaintiffs intended to call. Unfortunately, this does not address the bigger problem—the disclosure came after discovery had closed, meaning that defendants did not know what plaintiffs' witnesses would say, which obviously prejudices defendants. To alleviate this, the trial court noted that the only available remedy would be to afford more discovery and adjourn the matter a significant amount of time. The court decided this was too much to ask, given how long the case had been pending at that time (almost two years). The trial court's decision is reasonable and principled.

We also note that plaintiffs do not directly address the trial court's October 2022 analysis precluding them from calling witnesses at trial. Related to this point, plaintiff primarily argues that the trial court's main error was not analyzing the *Dean* factors at the time it struck plaintiffs' late witness list in February 2022. We disagree with this argument. The *Dean* factors are considered when deciding on a sanction, such as dismissal, for failing to timely file a witness list, not as a consideration for accepting a late-filed witness list. See *Duray Dev*, 288 Mich App at 164; *Vicencio v Ramirez*, 211 Mich App 501, 507; 536 NW2d 280 (1995) ("This Court has summarized some of the factors that a court should consider before imposing the sanction of dismissal[.]"), citing *Dean*, 182 Mich App at 32-33; *Dean*, 182 Mich App at 32 (describing the factors as ones that "should be considered in determining the appropriate sanction"). In other words, the trial court's decision to not accept the late-filed witness list was not a *sanction* for their failure to timely file a witness list; it was a decision to adhere to the court's scheduling order. The sanction is not allowing the witnesses to be called, which was only raised and decided at trial.

## IV. SANCTIONS

Plaintiffs next argue that the trial court erred when it sanctioned them for casting blame on defendants for plaintiffs' failure to realize the existence of the June 11, 2021 scheduling order. When a trial court's decision to sanction a litigant is premised on a finding of frivolousness, such

a decision is reviewed for clear error. See *Kitchen v Kitchen*, 465 Mich 654, 661; 641 NW2d 245 (2002). "A decision is clearly erroneous where, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. at 661-662.

The trial court stated that it was sanctioning plaintiffs for the reasons articulated by defendants. Defendants sought sanctions under MCR 1.109(E), which provides, in pertinent part:

>(5) *Effect of Signature*. The signature of a person filing a document, whether or not represented by an attorney, constitutes a certification by the signer that:

>(a) he or she has read the document;

>(b) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and

>(c) the document is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

>(6) *Sanctions for Violation*. If a document is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages.

Thus, under MCR 1.109(E)(6), sanctions are appropriate when, among other things, the party had no reasonable basis to believe that the facts underlying the party's legal position were true or the party's legal position was devoid of arguable legal merit. See also *Ford Motor Co v Dep't of Treasury*, 313 Mich App 572, 589; 884 NW2d 587 (2015).

The portion of plaintiffs' brief that the trial court found sanctionable started with the sentence, "Defendants are not without fault." Plaintiffs went on to aver that defendants were partially at "fault" because they failed to file an answer to the complaint. Although this statement is located in a section of plaintiffs' brief titled "Defendants Will Not Be Prejudiced by a Stay," the broad assertion goes beyond that particular concept of prejudice to imply that defendants shared some "fault" for plaintiffs' failure to not file their witness lists. Regardless of what defendants did or did not do, it is a complete stretch to label their action or inaction as "fault" in the context of plaintiffs not recognizing the existence of the June 11, 2021 scheduling order. Indeed, had defendants filed an answer, it is not evident why or how that event would have alerted plaintiffs to the existence of the June 11 order. This lack of causation or fault is even more evident because plaintiffs also claimed that they were under the impression that there was no scheduling order because one would be forthcoming only after their interlocutory appeal to this Court was resolved. Whether an answer was filed would not have changed that erroneous view.

Plaintiffs in this same section of their trial court brief also averred that defendants had "unclean hands," which prevented them from claiming any prejudice.

> It is well settled that one who seeks equitable relief must do so with clean hands. The unclean-hands doctrine is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the opposing party, and is only relevant to equitable actions or defenses. [*Varela v Spanski*, 329 Mich App 58, 83; 941 NW2d 60 (2019) (quotation marks, citations, and brackets omitted).]

On appeal, plaintiffs seem to acknowledge that the unclean-hands doctrine in the context of their motion in the lower court is inapplicable. Instead, they state on appeal that they were not invoking the formal doctrine but instead using the term "in [a] rushed fashion (having just discovered the witness list deadline issue)" to show that defendants also were not following the court rules. A trial court is not a mind-reader and would have had no way to know that despite citing "unclean hands," plaintiffs were not actually invoking the unclean-hands doctrine. A court should be allowed to presume that an attorney means what he says, and in this instance, plaintiffs' counsel cited the legal doctrine of unclean hands. See *Robinson v Peake*, 21 Vet App 545, 554 (2008) (stating that it is proper to presume that an experienced attorney "says what he means and means what he says" and that "[w]here an attorney uses terms of art that make sense in the context used, the [court] may reasonably conclude that there is no ambiguity to be resolved"), aff'd 557 F3d 1355 (CA Fed, 2009).

Accordingly, considering the circumstances, we are not left with a definite and firm conviction that the trial court made a mistake when it sanctioned plaintiffs for violating MCR 1.109(E).

## V. DISMISSAL UNDER MCR 2.403(N)(3)(c)

Plaintiffs argue that the trial court erred when it granted defendants' motion to dismiss with respect to Counts III and IV. We need not address this issue in light of our conclusion that the trial court did not err in preluding plaintiffs from calling any witnesses. See *Grubor Enterprises v Kortidis*, 201 Mich App 625, 629; 506 NW2d 614 (1993) (where a witness list is stricken or barred, the trial court may in its discretion allow individual named parties to testify, but not individuals representing institutional parties).

Without being able to present evidence, plaintiffs cannot prove damages, a necessary element. See *Van Buren Twp v Visteon Corp*, 319 Mich App 538, 550; 904 NW2d 192 (2017). Thus, even assuming that the trial court erred in dismissing some (or even all) of the claims, plaintiffs inability to prove damages would necessarily result in a judgment for defendants.[11]

---

[11] In theory, plaintiffs might be entitled to a judgment in their favor on liability in light of defendants' failure to file an answer, but with a damage award of zero. It would, however, be a

-18-

## VI. CONCLUSION

Affirmed.  Defendants may tax costs.

/s/ Kathleen A. Feeney
/s/ Michael J. Kelly
/s/ Michelle M. Rick

---

waste of judicial resources to empanel a jury merely to then require it to return a damage award of zero.